[Civ. No. 14682. Third Dist. Dec. 26, 1974.]

DISABLED AND BLIND ACTION COMMITTEE OF CALIFORNIA et al., Petitioners, v.
JAMES E. JENKINS, as Secretary, etc., et al., Respondents.

## COUNSEL

Ralph Santiago Abascal, Jay-Allen Eisen, Sharon J. Golub, Victoria J. DeGoff, David F. Chavkin, Carmen Massey and J. Kendrick Kresse for Petitioners.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Respondents.

## OPINION

**PARAS, J.**—This is an original class action for extraordinary relief in the nature of mandamus, seeking an interpretation of Welfare and Institutions Code section 12053 favorable to petitioners and its enforcement as so interpreted.

### STATUTORY BACKGROUND

The Social Security Act of 1935 created several grant-in-aid programs

to provide federal aid to states in partial reimbursement of state welfare expenditures (Wedemeyer & Moore, *The American Welfare System* (1966) 54 Cal.L.Rev. 326). Two grant-in-aid programs were originally established for needy adults, Old Age Assistance (42 U.S.C. § 301 et seq.), and Aid to the Blind (42 U.S.C. § 1201 et seq.); a third program was added in 1950, Aid to the Disabled (42 U.S.C. § 1351 et seq.).

The 1972 Congress substantially changed the system of paying welfare to needy adults. The Social Security Amendments of 1972 (Pub.L. 92-603, 86 Stat. 1329 et seq.—also known as H.R.-1)[1] repealed the former grant-in-aid programs as of January 1, 1974. In their place a single program was established under title XVI of H.R.-1 (42 U.S.C. §§ 1381-1385). This new system, known as the Supplemental Security Income (SSI) program, guarantees a monthly federal payment to needy blind, aged and disabled persons. Unlike payments under the former grant-in-aid programs, an individual's eligibility for SSI payments does not depend upon state action, since the program is fully administered by the Social Security Administration under nationwide standards.

The federal SSI payment is less than the amounts which many of the states paid under the former grant-in-aid programs. For that reason, Congress invited the states to pay additional moneys to SSI recipients (42 U.S.C. § 1382e(a).) These additional payments are called State Supplemental Payments (SSP).[2] Congress further provided that a state could elect either to administer its supplemental payment itself or by contract with the Secretary of Health, Education and Welfare (hereinafter Secretary and H.E.W. respectively) have its SSI program federally administered.

California's laws relating to public assistance are found in part 3 of division 9 of the Welfare and Institutions Code. Prior to H.R.-1, part 3 was divided into 10 chapters, including: chapter 1, General Provisions; chapter 2, Aid to Families with Dependent Children; chapter 3, Old Age Security Law; chapter 4, Aid to the Blind; chapter 5, Aid to the Potentially Self-Supporting Blind; chapter 6, Aid to the Needy Disa-

---

[1] Hereinafter, for the sake of brevity, the designation "H.R.-1" will be used for the 1972 Social Security Amendments.

[2] The renegotiation amendments of 1973 (Pub.L. 93-66, § 212(a)(3), 87 Stat. 155) required that each state supplement the SSI payment to insure that no one who received aid under a grant-in-aid program in December 1973 would suffer a reduction because of the conversion to the SSI program. A state which failed to make these supplemental payments to former grant-in-aid recipients would lose federal funds. For persons who first became eligible for aid under SSI after January 1, 1974, the state supplemental payment is optional. California has elected to pay SSP to all SSI recipients.

bled; and chapter 6.5,. Non-Medical Care Facilities and Supportive Home Care Services.

In response to the federal legislation, a number of bills were submitted in the 1973 Legislature for the purpose of implementing H.R.-1 in California.[3] By the end of the 1973 session however, no legislation had been enacted and the California Director of Social Services attempted to undertake compliance with the federal act by administrative regulation. On November 19, 1973, this court decided *California League of Senior Citizens Inc. v. Brian,* 35 Cal.App.3d 443 [110 Cal.Rptr. 809] in which it held that California could not enter into an H.R.-1 agreement with the Secretary through its Department of Social Welfare without legislative authorization.

The Legislature thereafter met in special session and on December 5, 1973, enacted amendments to part 3 of division 9 of the Welfare and Institutions Code to be effective immediately as an urgency statute. (Stats. 1973, ch. 1216.)[4] Chapter 3 (Old Age Security), chapter 4 (Aid to the Blind), and chapter 6 (Aid to the Needy Disabled), all were repealed; and in their place a new chapter 3 was enacted, dealing with all three categories. A new chapter 4 was enacted, covering emergency payments and special circumstances for those eligible under chapter 3. A number of sections were added to chapter 5 (Aid to the Potentially Self-Supporting Blind). And other sections of the remaining chapters of part 3 were amended, repealed or newly adopted.

The amount of SSP to be paid by California to needy persons who are aged, blind, or disabled is specified in section 12200. It reads: "An aged, blind or disabled applicant or recipient shall be paid an amount of aid which when added to his federal benefit [received under H.R.-1] . . . and other nonexempt income resources equals the following:" Then follows a series of monthly amounts for certain categories, such as blind, aged, a married couple both of whom qualify for benefits, etc. For a blind applicant the monthly sum is $265. For an aged or disabled applicant the sum is $235.

It is to be noted that the manner in which SSP aid is calculated is by a formula under which the applicant starts with his SSI income, to which is added all his other "nonexempt income." Where the sum of these two exceeds the monthly amount authorized, obviously no SSP aid results.

---

[3]Senate Bill 53, Senate Bill 110, Assembly Bill 18, Assembly Bill 134, Assembly Bill 853.

[4]Henceforth all code references are to the Welfare and Institutions Code, unless otherwise indicated. Henceforth also, the California Legislation of December 5, 1973, will be referred to as the "urgency legislation."

To the extent that these totals do not add up to the monthly amount specified for the applicant, he is then paid a sum of money which causes his total income to reach that monthly amount.

In addition to the foregoing basic aid, there are aid recipients who require "in home" care. An additional sum is provided to such persons for in home supportive care services under section 12300 et seq. Again, the nonexempt income of an applicant or recipient affects either eligibility for or amount of additional aid.

It can thus be seen that crucial to the determination of the amount of money which a welfare recipient receives is the amount of his income which is offset against the moneys otherwise provided for him. It is in this area that the disagreement between the parties exists.

It goes without saying that in the public assistance area, California's legislation must not be inconsistent with federal legislation. (§ 11003; Zunino v. Carlson (1973) 33 Cal.App.3d 36 [108 Cal.Rptr. 769].) Income is defined by section 1612 of H.R.-1 as being of two kinds, earned and unearned. Earned income is then defined as either wages or net earnings from self employment. Unearned income is defined to include all other income such as annuities, veterans' pensions, railroad retirement pensions, rents, dividends, interest, gifts, support payments, etc. Income of an ineligible (ineligible to receive welfare assistance) spouse of an eligible (eligible to receive welfare assistance) individual is by section 1614(f)(1) of H.R.-1 expressly deemed to be included in the income of the individual, *"whether or not available to such individual . . . ."* The federal law also provides that in addition to the exclusions from income or "disregards" specifically provided for in H.R.-1 itself, the states for SSP purposes may disregard additional amounts of earned and unearned income, provided that the states "shall include a provision specifying the amount of any such income that will be disregarded, if any." (H.R.-1, § 1616(c)(2).)

The new chapter 3 (§§ 12000-12400 inclusive) is the legislation with which this case is primarily concerned. Article I of chapter 3 contains four sections which are introductory in nature and are titled "General Provisions." Article II is titled "Definitions" and contains five such definitions. One of them, section 12053, is the specific cause of this litigation. It provides: "An applicant's share of his spouse's community property income is defined as the income which is community property subject to the direction and control of the applicant, except for the

earnings of his or her spouse." The word "applicant", although not specifically defined, means the person who is applying for or obtaining aid.

The question before us is whether section 12053 enacted a "disregard"[5] or exclusion of earnings of the spouse of a welfare recipient. The petitioners maintain that the Legislature intended by the wording of section 12053 to provide that none of the earnings of an ineligible spouse of an applicant or recipient shall be considered in making the determination of the amount of monthly funds to which the applicant is entitled. For example, petitioner Margaret Jones is 50 years old and suffers from multiple sclerosis. She lives with her husband James Jones and one 19-year-old child. She is totally paralyzed. She has no earnings of her own. Mr. Jones works as a machinist and earns $250 gross per week. Since Mrs. Jones has no earnings of her own, petitioner claims that she should receive monthly the full sum of $685 (basic grant of $235 plus attendant care payment of $450) with no reduction because of her husband's earnings. Respondent claims that section 12053 does not entitle petitioner Jones to have her husband's income disregarded, but that it should be considered income of Mrs. Jones except to the extent that the Secretary has provided by regulation for exclusions from it ($65 for work-related expenses, $70 for personal expenses, and $65 for each child).

There are two problems in connection with section 12053. First, what does it mean? Second, did the Legislature intend that it be operative rather than simply definitional?

## MEANING OF WELFARE AND INSTITUTIONS CODE SECTION 12053

It is a basic rule of statutory construction that a statute should be construed so as to give effect and meaning if possible to every clause and word contained in it. It is presumed that every word, phrase and provision was intended to have meaning. A construction which results in legislative words being used in vain or being surplusage is to be avoided. (*Mercer* v. *Perez* (1968) 68 Cal.2d 104 [65 Cal.Rptr. 315, 436 P.2d 315]; and cases cited in McK.Dig., Statutes, § 162 and in 45 Cal.Jur.2d, Statutes, § 117.)

---

[5]In the context of this case the word "disregard" has been used by counsel for the parties as a noun, to mean income to be disregarded under section 1616 (c)(2) of H.R.-1. While the term can be meaningfully so used, we will use the term "exclusion" in its place hereafter in order to avoid confusion with our use of the word "disregard" as a verb.

■ A reading of section 12053 immediately discloses that it contains incurable ambiguities. Initially we note that the expression "spouse's community property income" is self-contradictory. There is no such thing as the community property income of one spouse, since by definition community property income is income of both spouses, just as community property is the property of both. Furthermore, by legal definition, earnings of each spouse are subject to the direction and control of such spouse. (Civ. Code, §§ 5124 and 5125.)[6] It makes no sense to define "an applicant's share of . . . community property income" as the income which is community property "subject to the direction and control of the applicant," and then to except from that definition "the earnings of his or her spouse." For necessarily the earnings of his or her spouse are not subject to the direction and control of the applicant in the first place. We cannot "except" or exclude an item from a category which never included the item.

One way to seek a resolution of the ambiguous wording is to assume that the phrase "spouse's community property income" really means the spouse's earnings. This is perhaps reasonable, since those earnings are in fact community property and in a sense are the "spouse's community property," the spouse having worked for them. We next must ascertain the applicant's share of this income. Since the share is defined as that over which the applicant has control, and since only the earner has legal control of his earnings, the share is invariably nothing. Yet the very definition of a "share" (or anything else) presupposes that it is something, not nothing.

Another way to try to attribute a reasonable meaning to the statute is to ignore the words "his spouse's" and thus define "an applicant's share of community property income," a reasonable concept. But while this resolves the ambiguity insofar as that which is being defined, it does not help with the definition. Again we are left wondering why the spouse's earnings are excepted, when it is axiomatic that they could not ever be a part of "community property subject to the direction or control of the applicant." Moreover, with equal logic we can be drawn thus to the definition contended for alternatively by respondent, that if it be conceded that section 12053 was intended to be an exclusion of income, it excludes the community property subject to applicant's control, *but excepts from the exclusion the spouse's earnings.* Under that interpretation too, why exclude something which was not and could not be included in

---

[6]Effective January 1, 1975, by repeal of Civil Code section 5124 and amendment of Civil Code section 5125, both spouses have equal control of community personal property, including each other's earnings. This makes the concept of "community property subject to the direction and control of applicant" even more incomprehensible.

the first place? Yet both contentions in this regard are equally logical (or rather illogical).

We are mindful of the above cited rules of statutory construction which require us to construe legislation so as to give it effect and meaning *if at all possible. (Stafford* v. *Realty Board Service Corp.* (1952) 39 Cal.2d 797 [249 P.2d 241].) But when no matter which way one turns there is no sensible meaning to attribute to the language used, that rule cannot apply. ". . . when a statute is so vague and uncertain that a person of ordinary intelligence cannot understand its meaning, it may not be upheld as a valid statute . . . ." (*In re Leach* (1932) 215 Cal. 536, 544 [12 P.2d 3].)[7] Additionally, as hereinafter pointed out, the construction sought by petitioners would lead to absurd results. Even literal language of a statute may be disregarded to avoid absurdities or to uphold a clear contrary intent of the Legislature (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849 [59 Cal.Rptr. 609, 428 P.2d 593]; *Gibbons & Reed Co.* v. *Dept. of Motor Vehicles* (1963) 220 Cal.App.2d 277, 286 [33 Cal.Rptr. 688]; *Ivens* v. *Simon* (1963) 212 Cal.App.2d 177, 181 [27 Cal.Rptr. 801].) Certainly ambiguous and equivocal language of a statute is even more appropriately subject to such treatment. Where as here the statutory language is utterly incapable of a sensible interpretation, there should not be judicially legislated into it a meaning which is neither justified nor reasonable (see *infra*). Section 12053 is simply a fiasco of inept draftsmanship.

### EFFECT OF SECTION 12053

Assuming despite the foregoing that section 12053 has the meaning contended by petitioners (that a welfare recipient's share of his spouse's earnings is zero), the next question would be whether the Legislature truly intended it to be operative as an exclusion of spousal earnings. ■ We have concluded that it was not so intended. There are numerous convincing indications to this effect in the urgency legislation and in later legislative action; there are no such indications to the contrary.

1. First of all, section 12053 like the statutes immediately preceding and following it, on its face purports only to be a definition. Its location

---

[7]Although *In re Leach* enunciates this principle in the criminal law context, necessarily it must apply when appropriate to a civil case also. It is this concept which causes the sole disagreement between this and the concurring opinion. Justice Friedman is not prepared to hold a civil statute totally void for lack of clarity; and thus he struggles to give section 12053 a tortured meaning, which the writer respectfully asserts is not warranted by the words of section 12053 or any other statute.

in the code and under the heading "definitions" is of course meaningless (see § 6 and 33 Cal.L.Rev. 155). If its language were dispositive in addition to being definitional, we would treat it as dispositive. But where the language of section 12053 defines a term and does not offer to do anything else, that fact indicates that only a definition was intended.

2. The normal reason for the definition of a term in a body of legislation is that certain provisions elsewhere in the enactment use the term defined and the definition clarifies the term's meaning as thus used. What section 12053 defines is "an applicant's share of his spouse's community property income". Nowhere else do we find that expression used in any statute. Nowhere else in any operative provision do we find the expression "an applicant's share." Nowhere else do we find the expression "spouse's community property income."

"Income" is defined by section 12051; and that definition adopts the H.R.-1 definition of income (which includes spousal earnings), with the addition "except as otherwise specifically provided." Section 12053 does not otherwise provide, specifically or even generally; nor does any other section even remotely suggest that it does.

3. In ascertaining legislative intent, we may look to the entire body of legislation for meaning, as well as to the previous state of the legislation on the subject and the legislative history. (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526]; *Ingram* v. *Justice Court* (1968) 69 Cal.2d 832 [73 Cal.Rptr. 410, 447 P.2d 650, 36 A.L.R.3d 1391].) Looking elsewhere in the urgency legislation we note section 12152 which in part reads: "In determining eligibility of any individual for the *state supplementary payment administered by the federal government, in addition to any other income or resources disregarded by the secretary,* the following additional amounts of income . . . shall be disregarded:" (Italics added.) Thereafter a number of specific items of income and resources are mentioned. Obviously the opening paragraph of section 12152 is in direct response to the permission given by section 1616(c)(2) of H.R.-1 to enact further exclusions. Section 12152 does not include or mention the earnings of an ineligible spouse, although it was so obviously a proper place to do so if such earnings were to be disregarded. *Expressio unius est exclusio alterius.* Moreover section 12151 meticulously directs that there be disregarded certain exclusions provided for in chapter 4 (see § 12501—emergency payments) and chapter 6.5 (see § 13900 et seq.—out of home care), suggesting that the Legislature had exclusions very specifically in mind. This is an indication that section 12053, which was not referred to in section 12152, was not intended to operate as an exclusion.

4. In chapter 1 of part 3 (§ 11000 et seq.), under the heading "general provisions" (which apply to all welfare assistance programs), there has existed a series of additional exclusions. Some of these were amended by the urgency legislation, some were left intact, and some new exclusions were added. Section 11008.6 excludes relocation assistance benefits under three federal acts, the Housing Act of 1964, the Manpower Development and Training Act of 1962, and the Elementary and Secondary Education Act of 1965—it was left intact by the urgency legislation. Section 11008.7 excludes Indian Claim funds—it was left intact. Section 11008.9 was newly enacted by the urgency legislation, excluding extended opportunity services loans or grants under Education Code section 25527.3. Section 11009.1 provided for an exclusion of certain free board and lodging, applicable to all welfare programs—it was amended by the urgency legislation so as to be inapplicable to recipients under chapter 3. Section 11010's exclusionary provisions were amended by the urgency legislation and the section as amended specifically refers to the new section 12152 and its exclusions. Section 11012, which deals specifically with earnings of a spouse, was amended (to be further discussed hereinafter). Section 11018 provided for exclusion of casual income or income from inconsequential resources—it was amended so as to be inapplicable to recipients under the new chapter 3.

Such careful attention to exclusions, with unequivocally operative and dispositive provisions, dictates the conclusion that the Legislature both knew how to enact an exclusion of income and had no hesitancy in enacting it when desired. It also demonstrates that when it enacted section 12053 as a definition, the Legislature intended a definition only. To say otherwise would be to attribute a degree of ineptness to the Legislature which we do not believe it has. We cannot assume that the Legislature which covered a specific subject so thoroughly intended additionally to cover it by unwritten words and in an "oblique, confusing and ambiguous fashion." (*Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 152 [23 Cal.Rptr. 592, 373 P.2d 640].)

5. Further evidence of an absence of legislative intent to disregard the earnings of an applicant's spouse is found in section 11012. This section existed prior to the urgency legislation and was applicable to all categorical aid programs except for Aid to Families with Dependent Children. It very meaningfully provided as follows: "To encourage the spouse of an applicant or recipient to retain or seek employment in order to be self-supporting, taxpaying, and to avoid becoming a recipient of public aid, the net earnings of the spouse, up to the amount of two hundred dollars ($200) per month, after deduction for the expenses incurred in connection with such earnings, shall not be considered

community property in computing how much of said earnings should be allocated to the applicant or recipient as income to him. Where the spouse is engaged in seasonal employment, the estimated annual earnings of the spouse shall be prorated on a monthly basis."

Here was a section dealing specifically with the very subject of this litigation, the earnings of the spouse of the welfare recipient. It too was amended by the urgency legislation, thus informing us once more that the Legislature specifically had this subject in mind. The amendment repeated the foregoing language word for word, but changed the application of the section with the following added words: "This section shall apply only to the aid to the potentially self-supporting blind program." (Chapter 5, which it will be recalled is not an SSP program and was not repealed but only expanded by the urgency legislation.) This action by the Legislature clearly illustrates the precise opposite of what the petitioners contend. Since there was legislation specifically providing for partial exclusion of a spouse's earnings which was applicable to all welfare categories (except one) and which by amendment was now made inapplicable to SSI/SSP categories, it is quite apparent that the Legislature intended to disallow the exclusion of any portion of the spouse's earnings for SSP purposes. And where in addition to this action, the Legislature affirmatively enacted a series of specific additional exclusions in section 12152 and elsewhere, with express reference to the exclusions of the federal act, and did not provide for exclusion of spousal earnings, the conclusion becomes inescapable that the Legislature did not intend such earnings to be disregarded.

6. The pre-SSI version of section 11012 also provided prior to the urgency legislation "This section shall not be interpreted so as to repeal section 12658." Section 12658 (repealed by the urgency legislation), which was limited expressly to the Aid to the Blind and the Aid to the Potentially Self-Supporting Blind programs (articles 4 and 5), provided "an applicant's share of his wife's community income shall be determined in accordance with the rules set forth in section 12101 of this code." Section 12101 (also repealed by the urgency legislation) then defined such share as the income which is separate property, the income (excluding earnings) which is community property subject to the direction and control of the applicant, and the earnings of the applicant (not of the applicant's spouse). This all made good sense. For former section 11012, being of general application, excluded the first $200 of the ineligible spouse's earnings, yet it also provided that it would not be deemed to repeal section 12658, an inconsistent and far more liberal section excluding *all* of the spouse's earnings, but applicable to the blind programs only.

The new SSP section 11012, in addition to making its $200 spousal earnings exclusion inapplicable to any of the SSI/SSP programs, also states that it shall not be interpreted so as to repeal section 13066. Section 13066, newly enacted by the urgency legislation, is a variation of section 12053, and reads as follows: "For the purposes of this chapter (Chapter 5-Aid to the Potentially Self-Supporting Blind), an applicant's share of his wife's community income is defined as the income which is community property subject to the direction and control of the applicant, except for the earnings of his or her spouse."[8] The meticulous care with which the urgency legislation thus dispositively sought to protect a provision of the non-SSP Aid to the Potentially Self-Supporting Blind Program (and in the same statute withdrew a spousal earnings exclusion from the entire SSP program) is yet another convincing indication that the Legislature had in mind the possibility of disregarding spousal earnings in the SSP program, but consciously determined not to do so.[9]

7. Further corroboration of such legislative intent may be found in the fact that to construe section 12053 as contended by petitioners would lead to an absurd result (cf. *Interinsurance Exchange* v. *Ohio Cas. Ins. Co., supra,* 58 Cal.2d at p. 153). In the case of Mrs. Jones, she contends that she should receive the full benefit of $235 basic aid plus $450 in-home care services (a total of $685) and that the income of her husband (with whom she is living) of over $1,000 per month need not be used in any fashion to contribute to her care. Perhaps that may somehow be found palatable by some. But let us assume a hypothetical situation comparable to that of the Jones family where the husband earns $50,000 or more per year. There are undoubtedly such family situations in existence today. Under petitioners' interpretation, again the invalid wife would receive the full $685 and the husband would receive all of his $50,000 annually without any obligation to contribute any of it toward the support and care of the wife. This is palatable to no one. Such a result is indeed absurd, particularly in view of the obligation of each spouse to support the other

---

[8]Does section 13066 have any meaning? It substitutes "wife's community income" for "spouse's community income." It appears to assume that only male welfare recipients can be blind. Also it is subject to the same inherent ambiguities as section 12053. Furthermore it is not expressly operative any more than its counterpart. By considerable and probably inordinate stretching, however, because of the position it occupies among other statutes, it could be construed as an exclusion for purposes of the "Aid to the Self-Supporting Blind Program." If so construed, since it is limited to a non-SSP program and provides for an exclusion of an ineglibile spouse's income, it is a further indication that insofar as chapter 3, which is an SSI/SSP program, section 12053 was not intended to be operative, there being no similar reference to section 12053 in section 11012.

[9]Noteworthy also in chapter 5 is the newly enacted section 13063, which provides again for an express exclusion of income.

spouse, which is expressly provided by our law. (See Civ. Code, § 5100.)[10]

Respondent points out another absurd result of the interpretation contended for by petitioners. We are concerned with income of an ineligible spouse, i.e., one who is not himself or herself receiving or qualified to receive public assistance. Very clearly under section 12200, the income of either spouse is considered if both are eligible. So under petitioner's interpretation, a 65-year-old woman would be entitled to a full cash grant even though her 64-year-old husband (neither blind nor disabled) earns $50,000 annually. But the next year when the husband is 65, neither one would be entitled to aid.

Petitioners suggest that the provisions of the federal law which "deem" the earned income of a noneligible spouse to be the income of an eligible person are somehow unfair in that such money is available to the spouse in theory only. This is not so. It is the law of California that each spouse must support the other spouse, and it follows that he or she must use whatever income and resources are available for this purpose. (See Civ. Code, § 5132.) Thus where the spouse of the eligible recipient does in fact earn $50,000 annually, that money is not available to the eligible spouse in theory only, but is available as a matter of legal fact. Even without the legal liability imposed by Civil Code section 5100, it is certainly to be expected that an average married person considers that his income is to be used for the support of both himself and his spouse. To hold as petitioners contend would be to say that married persons jealously and selfishly guard their earnings against any use thereof by their spouse; this is completely contrary to reality, and also to propriety.

8. Still further corroboration for our conclusion as to the intent of the Legislature is to be found in the provisions of the federal legislation. It is provided there that for the purpose of determining eligibility for the SSI benefit the "income" of the applicant only excludes those state assistance payments that are "based on need." (42 U.S.C. § 1382e(a).) Also the Secretary of HEW is authorized to agree to administer for a state only the kind of state supplemental payments which are "cash payments which are made by a State . . . as assistance *based on need . . .*" (H.R.-1, § 1616(a) of the Social Security Act as amended by Pub. L. 92-603; 42 U.S.C. § 1382e(a).) (Italics added.) Hypothetically, the wife of a man earning $50,000 a year is not in "need" and to give her SSI benefits could

---

[10]California has never in its history legislated a total disregard of earnings of a spouse of a welfare recipient; and if it intended to now do so, it would be expected to act unequivocally. *(Interinsurance Exchange* v. *Ohio Cas. Ins. Co., supra,* 58 Cal.2d 142.)

well result in a refusal by the federal government to disregard the SSP from "income" for purposes of the SSI payment and also in invalidation of the agreement contemplated by section 12100. This surely was not intended by the Legislature.

9. To support their view of a legislative intention that section 12053 be operative, petitioners have argued that in the closing days of the 1974 legislative session (Sept. 11, 1974) Assembly Bill 3469 was passed (vetoed by the Governor on Sept. 27, 1974) which purported to repeal section 12053 and enact in its stead section 12152.1. The new section 12152.1 provided that income of the ineligible spouse shall be disregarded up to $100 per month, as well as income of the eligible spouse up to $105 per month. In this statute the Legislature stated its intention as follows:

"The Legislature hereby finds that the income exclusions provided for in federal law are wholly insufficient to properly encourage an ineligible spouse of an eligible individual to retain or seek employment so as to become or remain self-supporting, taxpaying and to avoid becoming a recipient of public social services.

"The Legislature further finds that the federal income exclusions are wholly insufficient to eliminate both the economic barrier to marriages between recipients and non-recipients and the inducement to the dissolution of existing marriages between such persons, which are otherwise inherent in federal law. Incalculable social benefits flow from marriages that include citizens who are in their later years or are disabled. The physical and mental well-being of such persons is significantly enhanced by the continuing care, support and affection given them by their spouses. Such marriages thereby reduce medical as well as institutional costs to the state.

"The Legislature finds, therefore, *that it is in the interest of the state to require, in addition to the income exclusions already required in section 12152 of this code, the income exclusions* provided for in this section." (Italics added.)

As claimed by petitioners, this language expressed the legislative intent to partially exclude income of the ineligible spouse from the eligible spouse's determination of eligibility or award. The language expressly states that the Legislature believed that the federal exclusions were insufficient and that in addition to the exclusions provided for already in section 12152, this additional exclusion was needed. But why would the Legislature say this and why would it legislate the $100 per month exclusion if it felt that section 12053 was already operative to

exclude *all* income of the ineligible spouse? If section 12053 was operative, the purpose set forth in Assembly Bill 3469 would already have been served, and the language expressing the legislative intent would be entirely inappropriate. The only way it makes sense for the Legislature to have thus stated its intent is on the basis of its awareness that its then existing law (at the time of passage of Assem. Bill 3469) did not provide for any exclusion of spousal earnings.

If it be claimed on the other hand that the Legislature intended in Assembly Bill 3469 to *reduce* the amount of income to disregard (which claim is inevitable if it be conceded that § 12053 is operative), then the introductory language of Assembly Bill 3469 is hopelessly inappropriate, for then such language should be justifying a *reduction* of exclusions rather than an increase. It definitely does not do that. As above stated, the only sensible way to interpret the introductory language is to conclude that the Legislature intended an additional exclusion of income.

Assembly Bill 3469 and its express language thus demonstrate that the Legislature had prior thereto intended that there be no exclusion of an ineligible spouse's earnings and hence that section 12053 was inoperative. It repealed section 12053 for that very reason, and substituted an operative and meaningful provision for an inoperative and meaningless one. If there had been any doubt of the legislative intention that section 12053 not operate as an exclusion of spousal earnings, it was forever dispelled by the passage of Assembly Bill 3469.

Our holding that section 12053 is not an exclusion of spousal earnings suggests another question. What does section 12053 mean and why was it enacted? We have carefully searched not only all sections of part 3, both before and after the urgency legislation, but also all bills on the subject during the 1973 legislative session and their histories (Sen. Bill 53, Sen. Bill 110, Assem. Bill 18, Assem. Bill 134 and Assem. Bill 853), seeking an answer to these questions. We found none. Without speculation, we cannot really explain how or why the language of section 12053 or some variation thereof found its way into most of the bills but was never made operative in any of them.[11] The only reasonable conclusion is that with the pressure of the approaching effective date of H.R.-1 and with the

[11]We do note that section 12053 does not stand alone in the urgency legislation as a statute with no apparent effect. Section 12003 deals with the residence or domicile of spouses and minor children "for purposes of this chapter" (chapter 3). Nowhere thereafter in chapter 3 is there a single reference to residence, or any word to suggest that there was a reason to so carefully define and explain it.

extreme emergency conditions following our decision in *Senior Citizens Inc.* v. *Brian, supra,* the Legislature was simply careless.[12]

Section 12004 provides that chapter 3 shall be liberally construed in favor of aged, blind and disabled recipients. But to do what petitioners ask here would not be merely to construe a statute in favor of the beneficiaries of welfare assistance; it would be to judicially create a benefit for them which it is clear to us the Legislature did not intend them to have. We cannot and will not, under the guise of statutory construction, legislate a fiction into law.

The petition is denied and the stay order heretofore issued is dissolved.

**FRIEDMAN, Acting P. J.**—I concur in the result but would support it in a somewhat different manner. As the court's opinion points out, Welfare and Institutions Code section 12053 is hopelessly confused. Two basic rules of statutory interpretation are mandatory upon us: One, the statute is not surplusage, cannot be ignored and must be given effect if at all possible. Two, it must be given an effect, if at all possible, consistent with the discerned objective of the larger enactment of which it forms a part.

Welfare and Institutions Code section 12200 declares that recipients shall receive SSP payments which, when added to federal benefits and other *nonexempt income resources,* equal specified monthly amounts. For this purpose, section 12051 defines *income* as both *earned* and *unearned* income as defined by title XVI of the Social Security Act (H.R.-1). Section 12053, the troublesome and almost incomprehensible statute in suit, declares: "An applicant's share of his spouse's community property income is defined as the income which is community property subject to the direction and control of the applicant, except for the earnings of his or her spouse."

By permitting the various states to exempt or exclude certain kinds of income for the purpose of their own SSP programs, title XVI of the Social Security Act gives each state leeway to fix the living standard of recipients at a level selected by the legislature of that state. The same leeway also permits each state to adopt income exclusions which conform to that state's marital property system.

---

[12]The Legislative Counsel's office has given a written opinion that section 12053 is both meaningful in the manner contended by petitioners and operative; and petitioners have urged us to consider it. Presumably that office drafted section 12053 and thus created the monster with which we deal. Its opinion is doubtless as good as its creation. We reject it.

California's community property law traditionally vested the husband with management and control of community personal property, except as to the wife's earnings. (Civ. Code, § 5124.) Commencing January 1, 1975, Civil Code section 5125 will vest either spouse with control over community personal property (without exclusion of either's earnings). In framing the 1973 SSP legislation, the Legislature faced the necessity of deciding how a married couple's community income would affect SSP payments when one spouse was eligible and the other ineligible.

Section 12051 fulfilled part of the need. By including earned as well as unearned income in the definition of income, section 12051 assured that a married applicant's entire earnings, although community property, would be classed as nonexempt income resources under section 12200. In addition to direct receipts of community income, a married applicant would be entitled to a "share" amounting to one-half the community income, earned and unearned, received by the ineligible spouse. To complete the statutory spectrum, the draftsman needed some other provision to specify the effect of "the applicant's share" of community income which came into the hands of the spouse.

Despite its opaque language, section 12053 seems designed to fulfill that need. Its initial phrase *an applicant's share of his spouse's community property income* appears as a feeble but genuine attempt to describe an economic resource to be included in the *nonexempt income resources* mentioned in section 12200. So included, *an applicant's share* (i.e., one-half the income) would form a disqualifying or diminishing factor in calculating SSP aid. If section 12053 does not serve that purpose, it serves no purpose at all.

Once section 12053 is accepted as a specification of nonexempt income, the next inquiry is whether it draws a line between unearned and earned community income. At that stage, an argument could be made that the section's last phrase *except for the earnings of his or her spouse* is designed to exclude the spouse's earnings from the applicant's nonexempt income. Four factors impel rejection of that argument: (1) community ownership of the ineligible spouse's earnings; (2) the possibility of a high level of earnings; (3) mutual duties of inter-spousal support, and (4) the SSP program's aim of assisting only the needy.

The total objective of the entire enactment repels the interpretation sought by petitioners. Section 12053 expresses a design to charge a share of community property income to the applicant spouse, but narrows that

charge to *income which is subject to the direction and control of the applicant.* In turn, the exception for earnings narrows (i.e., it serves as a proviso) upon the category of *income which is subject to the direction and control of the applicant.* However clumsily, the final clause serves as an exception to the last and not the next-to-last antecedent. Only thus may it fulfill a function consistent with the aggregate objective of the comprehensive enactment in which it plays a part. Thus, as I construe this perplexing statute, it includes as part of the applicant's nonexempt resources one-half of all community income received by the ineligible spouse.

Petitioners' application for a hearing by the Supreme Court was denied February 19, 1975.