[No. B003190. Second Dist., Div. Five. June 7, 1985.]

BELL COMMUNITY REDEVELOPMENT AGENCY,
Plaintiff and Appellant, v.
BYRON L. WOOSLEY, as Secretary, etc., Defendant and Respondent.

[No. B003007. Second Dist., Div. Five. June 7, 1985.]

BELL COMMUNITY REDEVELOPMENT AGENCY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
BYRON L. WOOSLEY, as Secretary, etc., Real Party in Interest.

**COUNSEL**

J. Robert Flandrick, Burke, Williams & Sorensen and James Warren Beebe for Plaintiff and Appellant and Petitioner.

Jones, Hall, Hill & White, Robert G. Auwberry, Herbert M. Weiser, Lance E. Garber, Weiser, Kane, Ballmer & Bankman, Steven H. Goldfarb, Lee C. Rosenthal, Goldfarb & Lipman, Thomas P. Clark, Jr., David R. McEwen, Stradling, Yocea, Carlson & Rauth, Joseph E. Coomes, Jr., T. Brent Hawkins and McDonough, Holland & Allen as Amici Curiae on behalf of Plaintiff and Defendant.

Irving S. Feffer for Defendant and Respondent and Real Party in Interest.

No appearance for Respondent Court.

**OPINION**

**HASTINGS, J.**—This is an appeal from a denial of a petition for writ of mandate. Appellant Bell Community Redevelopment Agency sought to compel respondent Woosley, the Agency Secretary, to publish a notice inviting bids on the Agency's bonds. We reverse the superior court denial and order the writ of mandate to issue.

A discussion of the issues raised by this appeal perforce begins with a brief discussion of redevelopment law. California's redevelopment law was first passed in the 1950's.[1] The stated purpose is to present communities with a vehicle by which to eliminate the physical, social and economic liabilities characteristic of blighted areas.

The redevelopment process[2] begins when a community forms a Redevelopment Agency (Agency) which, along with the planning commission, identifies a predominantly urbanized, blighted area and designates it a redevelopment or project area. A plan for the project area is formulated and ultimately adopted by the local government body. ■ Though an Agency is given broad powers to implement this plan, it does not have the power nor ability to levy a tax to finance these efforts. (*Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 106 [211 Cal.Rptr. 133, 695 P.2d 220]; 56 Ops.Cal.Atty.Gen. 464, 469 (1973).) Instead, the Agency obtains the funds needed to acquire property and make improvements by accepting financial assistance from any public or private source, borrowing money, and issuing bonds. Incurrence of debt is by far the most common method utilized by an Agency. This is done through the issuance of "tax allocation bonds." The primary source of repayment of this indebtedness is "tax increments" received by the agency from governmental taxing agencies. The mechanics of tax increment financing was described in *Redevelopment Agency of San Bernardino* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133].) "[I]f, after a redevelopment project has been approved, the *assessed valuation of taxable property* in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project." (Italics in original.) The increase in assessed valuation occurs because of the new construction and revitalization in the project area. Once the debt is paid, the additional tax revenues revert back to the taxing agency. The Legislature devised this financing scheme so that redevelopment would largely pay for itself.

Through the years the validity of tax increment financing has been reviewed by our courts and consistently upheld. (*In re Redevelopment Plan*

---

[1] It was first adopted in 1951 and, after voter approval, was made a part of the California Constitution in 1952 as section 19 of article XIII, since renumbered as article XVI, section 16.

[2] The process is codified in Health and Safety Code section 33000 et seq.

*for Bunker Hill* (1964) 61 Cal.2d 21, 72 [37 Cal.Rptr. 74, 389 P.2d 538]; *Redevelopment Agency* v. *Cooper* (1968) 267 Cal.App.2d 70 [72 Cal.Rptr. 557]; *Redevelopment Agency* v. *Malaki* (1963) 216 Cal.App.2d 480, 481-484 [31 Cal.Rptr. 92].)

Against this backdrop, California voters in 1978 approved Jarvis I (Prop. 13) which became article XIII A of our Constitution and in 1979 approved the Gann Initiative (Prop. 4) which became article XIII B. It is the applicability of the latter initiative that is at issue in this case.

In total, article XIII B contains 11 sections. For purposes of this discussion the following six are pertinent:

*Section 1* limits the "total annual appropriations subject to limitation" of certain government entities funded by proceeds of taxes to "the appropriations limit of such entity for the prior year, adjusted for changes in cost of living and population . . . ."

*Section 2* provides that revenues received in excess of the appropriated amount "shall be returned by revision of tax rates or fee schedules within the next two subsequent fiscal years."

*Section 4* provides that the appropriations limit of an entity of government may be changed by vote of the electors of such entity.

*Section 7* provides that article XIII B shall not be construed to impair the ability of state or local government to meet obligations with respect to existing or future bonded indebtedness.

*Section 8* contains an extensive list of definitions. It defines "appropriations subject to limitations" of local government entity as "(b) . . . any authorization to expend during a fiscal year the proceeds of taxes levied by or for that entity." It also defines "proceeds of taxes" in subdivision (c) to include all taxes; and revenues from license and user fees in excess of the costs of regulation; investment of tax revenues; and subventions received by the local government from the state. Subdivision (d) defines local government as "any city, county, city and county, school district, special district, authority or other political subdivision of or within the state."

*Section 9* excludes from appropriations subject to limitations "appropriations for debt service, appropriations to comply with court mandates, and appropriations of special districts with tax rates in 1977-78 of less than 12.5 cents per $100 of assessed valuation."

"[T]he thrust of article XIII B is toward placing certain limitations on the growth of appropriations at both the state and local government level; . . ." (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 446 [31 Cal.Rptr. 92].) This purpose is accomplished by limiting the " 'total annual appropriations subject to limitation' " so that " 'a governmental entity may not spend more in one year on a program funded with the proceeds of taxes than it did in the prior year.' " (*Huntington Park, supra,* 38 Cal.3d at p. 107.)

In 1980 the state Legislature passed Health and Safety Code section 33678[3] (§ 33678) as an urgency measure to make clear that the allocation and payment to redevelopment agencies of tax increments is not to be deemed the receipt of "proceeds of taxes" by an agency as defined by article XIII B. Apparently the Legislature so acted in response to the uncertainty created by article XIII B's failure to mention its effect on article XVI, section 16 (the redevelopment law) either in the statutory language, in the official analysis by the Legislative Analyst or in the official arguments included in the voter pamphlet.

FACTS

On June 21, 1976, appellant Bell Community Redevelopment Agency (Agency) adopted a redevelopment plan for the Cheli Industrial Redevelopment Project (Project).[4] The Project involved a $3 million tax allocation bond issue to effectuate the purchase of the property and the proposed development.

On August 15, 1983, the Bell City Council and the Agency concluded all necessary steps to issue the allocation bonds. The bonds are to be repaid solely from tax increment funds. Thereafter, the Agency secretary (respondent) refused to publish the notice inviting bids. He reasoned that the Agency and the city council had acted beyond their powers because the debt service on the proposed bond issue constituted an appropriation in excess of that allowed by article XIII B. Respondent claimed that this proposed notice committed him to appropriate and expend "proceeds of taxes" without regard to the appropriation limitations imposed by article XIII B.

On October 4, 1983, the Agency petitioned the Los Angeles Superior Court for a writ of mandate to compel respondent to publish the notice. The Agency argued (1) that section 33678 was a legislative interpretation of

---

[3]This section is part of Senate Bill No. 1972, Statutes 1980, chapter 1342.

[4]The plan envisioned industrial and commercial development within the Cheli Air Base, a former federal facility.

article XIII B and a valid reconciliation of article XIII B and article XVI, section 16. To hold otherwise, the Agency argued, would be to interpret article XIII B as a repeal by implication of article XVI, section 16—a finding which is contrary to the presumption against repeal by implication and the presumption of constitutionality accorded a legislative interpretation of our constitution; and (2) that the findings of the Legislature in adopting chapter 1342 (of which § 37678 is a part) are reasonable in their statement of facts constituting the necessity for such action and, consequently, are to be given great weight; and that chapter 1342 reasonably reconciles the language of article XVI, section 16, and article XIII B. Respondent countered by asserting that article XIII B did prohibit the issuance of the bonds because it was applicable to the Agency since it is a governmental entity as defined by section 8, subdivision (d); that article XIII B repealed by implication article XVI, section 16; and that the Legislature in section 33678 acted unconstitutionally because it went beyond interpretation to revision of article XIII B.

On November 22, 1983, the court denied the petition for the writ of mandate. In doing so the court found that (1) Health and Safety Code section 33678 (ch. 1342) is unconstitutional on its face; (2) article XIII B is a valid and subsisting provision of the Constitution; (3) Bell Community Redevelopment is subject to the provisions of article XIII B; (4) tax increment proceeds are taxes levied for a redevelopment agency; (5) tax increments authorized by article XVI, section 16, are not exempt from article XIII B.

On appeal, the parties reassert the arguments summarized above. In addition, two amicus briefs have been filed. One is on behalf of the Community Redevelopment Agencies Association and twenty-three California cities.

DISCUSSION

The threshold issue is whether tax increment financing is subject to the strictures of article XIII B. The superior court concluded that it was. It did so by making the determination that the Legislature acted unconstitutionally when it enacted section 33678, exempting tax increments from XIII B. The court then analyzed the language of section 8 and found that a redevelopment agency is an "entity of local government" and that the tax increment funds are collected by the county *for* the agency; therefore, they

are "appropriations subject to limitation" as defined in section 8, subdivision (b).[5]

To the extent that the court's analysis was confined to section 8, it is plausible. However, there is additional language in article XIII B, section 7, which we find controlling. Appellant and amici curiae advance the argument that the language of section 7 shows there was no intent in article XIII B to inhibit the use of tax allocation bonds. We agree. Section 7 provides: "Nothing in this Article shall be construed to impair the ability of the state or of any local government to meet its obligations with respect to *existing or future* bonded indebtedness." (Italics added.) As discussed above, tax-increment financing is the method through which repayment of tax allocation bonds is effectuated. Health and Safety Code section 33334.1 defines tax allocation bonds as a "bonded indebtedness."

To construe section 8, subdivision (b), as the court did, as including tax-increment payments, would be directly contrary to the mandate of section 7 because such construction would impair the ability of redevelopment agencies to meet their obligations with respect to their further tax allocation bond issues.

Article XVI, section 16, provides that tax-increment revenues "may be irrevocably pledged" to the payment of tax allocation bonds. If bonds must annually compete for payment within an annual appropriations limit, and their payment depend upon complying with the such limit, it is clear that tax allocation proceeds cannot be irrevocably pledged to the payment of the bonds. Annual bond payments would be contingent upon factors extraneous to the pledge. That is, bond payments would be revocable every year of their life to the extent that they conflicted with an annual appropriation limit. The untoward effect would be that bonds would become unsaleable because a purchaser could not depend upon the agency having a sure source of payment for such bonds. (Cf. *Redevelopment Agency* v. *County of San Bernardino, supra,* 21 Cal.3d at p. 264.) Clearly, this results in an impairment of the ability of the redevelopment agency "to meet its obligations with respect to existing or future bonded indebtedness" and is contrary to the mandates of article XIII B, section 7.

---

[5]This is a case of first impression. In *Huntington Park, supra,* 38 Cal.3d 100, the Supreme Court chose specifically not to resolve this issue. In footnote 3, at page 108, it states: "Health and Safety Code section 33678, subdivision (a), declares the proceeds received from tax-increment financing to be outside article XIII B. We need not decide the validity of this section, as tax-increment financing is not at issue here, and we find there is a 'transfer of financial responsibility' within the meaning of section 33678 and article XIII B, section 3, subdivision (a), discussed below. For the same reasons, we find it unnecessary to consider whether article XIII B applies to redevelopment agencies."

Upon a reading of the complete text of article XIII B we find further support for this holding. Article XIII B governs "appropriations subject to limitation"; a redevelopment agency has no appropriation limit. (*Huntington Park, supra,* 38 Cal.3d at p. 108.) Section 2 provides that revenues in excess of the appropriations limit be returned to the taxpayers; article XVI, section 16 and case law require that tax increments be returned to the taxing entity upon elimination of the debt. Section 4 calls for a vote of the "electors" of an entity to change an appropriations limit; dependence on such periodic approval for repayment would effectively negate the viability of a bond issuance. Section 9, subdivision (a) expressly excludes debt service from "appropriations subject to limitations"; tax increments are exactly that.

■ At the hearing, the court and counsel engaged in a lively discussion regarding the meaning of "taxes levied by or for [an] entity." (Art. XIII B, § 8, subd. (b).) The court determined that the county is levying and collecting taxes "for" the redevelopment agency. Appellant asserts and we concur that the court's conclusion is erroneous.

The phrase "to levy taxes by or for an entity" has a special meaning of long-standing. The concept of one entity levying taxes for another dates back to at least 1895 (Stats. 1895, p. 219) and the adoption of an act providing for the levy of taxes "by or for" municipal corporations. This act allowed general law and charter cities to continue to exercise their taxing power directly or, if they so desired, to have the county levy and collect their taxes for them. (*Griggs* v. *Hartzoke* (1910) 13 Cal.App. 429, 430-432 [109 P. 1104]; *County of Los Angeles* v. *Superior Court* (1941) 17 Cal.2d 707, 710-711 [112 P.2d 10].) The legal effect of this arrangement, as explained by case law, was that the taxing power exercised was that of the city, and it remained in the city. The county officers in levying taxes for the city became ex-officio officers of the city and exercised the city's taxing power. (*Madary* v. *City of Fresno* (1912) 20 Cal.App. 91, 93-94 [128 P. 340].) In levying taxes for the city the county was levying "municipal taxes" through the ordinary county machinery. (*Griggs, supra,* at p. 432.)

Thus, the salient characteristics of one entity levying taxes "for" another entity are: (1) the entity for whom the taxes are levied has the taxing power; (2) the levying officers of the county exercise the taxing power of the entity for whom they are levying; (3) they exercise such power as ex-officio officers of that entity, and (4) the taxes collected are those of the "levied for" entity. It is obvious that none of these characteristics has any applicability to the redevelopment process as set forth in article XVI, section 16. The first and foremost fact which mandates this conclusion is that a redevelop-

ment agency does not have the power to tax. (*Huntington, supra,* 38 Cal.3d 100.) That being the case, we resolve that the county is not levying taxes "for" the Agency.

In addition, we are supported by the generalized view of construction that "when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it." (Code Civ. Proc., § 1859.) ██ Article XVI, section 16, with careful particularity, sets forth the entire redevelopment process. The constitutional process relating to tax increment financing of redevelopment agencies is a special provision, applying only to redevelopment agencies. Article XIII B (Gann Initiative) is a general enactment which, if it covers redevelopment agencies at all, does so by "unwritten words and in an 'oblique, confusing and ambiguous fashion.' [Citation.]" (*Disabled & Blind Action Comm. of Cal.* v. *Jenkins* (1974) 44 Cal.App.3d 74, 83 [118 Cal.Rptr. 536].)

██ Finally, we discuss the validity of section 33678, the legislative enactment which exempted tax increment financing from the requirements of article XIII B.[6] The lower court found this action to be an unconstitutional attempt by the Legislature to rewrite, rather than interpret, article XIII B. Much of the court's reasoning hinged on its interpretation of the "by or for" phrase discussed above, which we have found to be erroneous. (*Supra.*) ██ In addition, however, there is "the strong presumption in favor of the legislature's interpretation of a provision of the Constitution." (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 692 [97 Cal.Rptr. 1, 488 P.2d 161].) ██ This presumption prompts our finding

---

[6]Section 33678 in pertinent part, provides: "(a) This section implements and fulfills the intent of this article and of Article XIII B and Section 16 of Article XVI of the California Constitution. The allocation and payment to an [redevelopment] agency of the portion of taxes specified in subdivision (b) of section 33670 [i.e. tax increments] for the purpose of paying principal of, or interest on, loans, advances, or indebtedness incurred for redevelopment activity, as defined in subdivision (b) of this section, shall not be deemed the receipt by an agency of proceeds of taxes levied by or on behalf of the agency within the meaning or for the purposes of Article XIII B of the California Constitution, nor shall such portion of taxes be deemed receipt of proceeds of taxes by, or an appropriation subject to limitation of, any other public body within the meaning or for purposes of Article XIII B of the California Constitution or any statutory provision enacted in implementation of Article XIII B. The allocation and payment to an agency of such portion of taxes shall not be deemed the appropriation by a redevelopment agency of proceeds of taxes levied by or on behalf of a redevelopment agency within the meaning or for purposes of Article XIII B of the California Constitution. . . . [¶] Should any law hereafter enacted, without a vote of the electorate, confer taxing power upon an agency, the exercise of such power by the agency in any fiscal year shall be deemed a transfer of financial responsibility from the community to the agency for such fiscal year within the meaning of subdivision (a) of Section 3 of Article XIII B of the California Constitution."

that section 33678 is a valid legislative interpretation and reconciliation of article XIII B and article XVI, section 16.

As noted previously, article XIII B fails to mention its effect on the redevelopment process. The statutory language, the official analysis by the legislative analyst, the official arguments included in the voter pamphlet are all silent on this matter. It is clear from the language of section 33678, quoted *ante* in footnote 6, that the Legislature intended to interpret the interrelationship between article XIII B and article XVI, section 16, and to dispel any ambiguity. ■■■ " '[W]here a constitutional provision may well have either of two meanings, it is a fundamental rule of constitutional construction that, if the Legislature has by statute adopted one, its action in this respect is well nigh, if not completely, controlling. When the Legislature has once construed the constitution, for the courts then to place a different construction upon it means they must declare void the action of the Legislature. It is no small matter for one branch of the government to annul the formal exercise by another and coordinate branch of power committed to the latter, and the courts should not and must not annul, as contrary to the constitution, a statute passed by the Legislature, unless it can be said of the statute that it positively and certainly is opposed to the constitution.' " (*Methodist Hospital* v. *Saylor, supra,* 5 Cal.3d at p. 692, quoting *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].) ■■■ For the reasons stated above, we conclude that section 33678 is not opposed to the Constitution.

The denial of the petition for writ of mandate is reversed. Let the writ issue.

Feinerman, P. J., and Ashby, J., concurred.