TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 97-906 |
| of | : | |
| | : | January 16, 1998 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY M. SUMMERS | : | |
| Deputy Attorney General | : | |
| | : | |

_____

THE HONORABLE BILL MORROW, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following questions:

1.      May a city or county form an infrastructure financing district under which incremental increases in property taxes are allocated to finance public capital facilities associated with the district?

2.      If so, may the formation of the infrastructure financing district be delayed until after the facilities to be financed are wholly or partially constructed?

CONCLUSIONS

1.      A city or county may form an infrastructure financing district under which incremental increases in property taxes are allocated to finance public capital facilities associated with the district.

2.      If formation of the infrastructure financing district is delayed until after the facilities to be financed are wholly or partially constructed, only those facilities that were not completed and provided for use by the city or county prior to formation of the district may be financed through incremental increases in property taxes.

ANALYSIS

The Legislature has enacted a comprehensive statutory scheme, the Infrastructure Financing District Act (Gov. Code, §§ 53395-53397.11; "Act"), **Footnote No. 1** authorizing a city, county, or

city and county to create an infrastructure financing district as a means of financing the construction of public works and facilities. The funding mechanism provided in the legislation is known as "tax increment financing" and is currently used by redevelopment agencies throughout the state. (See, e.g., *Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 259.) This type of public financing anticipates that the new facilities **Footnote No. 2** will increase the assessed valuation of taxable property in the surrounding area, with the resulting increase in taxes divided between the city **Footnote No. 3** and the other taxing agencies within the district. Thus, tax increment financing allows the public facilities to pay for themselves by increasing the value of the surrounding property, raising the tax base. (*Cf. Bell Community Redevelopment Agency* v. *Woosley* (1985) 169 Cal.App.3d 24, 27.)

The Act places several limitations upon the funding of public facilities. Subdivision (a) of section 53395.3 provides:

"A district may finance (1) the purchase, construction, expansion, improvement, seismic retrofit, or rehabilitation of any real or other tangible property with an estimated useful life of 15 years or longer which satisfies the requirements of subdivision (b), (2) may finance planning and design work which is directly related to the purchase, construction, expansion, or rehabilitation of that property and (3) the costs described in Sections 53395.5, and 53396.5. A district may only finance the purchase of facilities for which construction has been completed, as determined by the legislative body. The facilities need not be physically located within the boundaries of the district. A district may not finance routine maintenance, repair work, or the costs of ongoing operation or providing services of any kind." **Footnote No. 4**

Various procedural prerequisites must be met before an infrastructure financing district may be formed, including (1) each affected taxing entity that will be subject to the division of taxes must, by resolution, approve the financing plan, and (2) the voters in the area of the district must approve creating the infrastructure financing district by a two-thirds vote. (§§ 53395.19, 53395.23.)

1. Constitutional Validity of the Statutory Scheme

The first question to be resolved is whether the Act's financing scheme for the construction of public facilities is constitutional. We conclude that the Act meets all constitutional requirements.

We first address article XIII A of the Constitution, which limits the maximum amount of ad valorem taxes on real property to one percent of the value of the property and limits year-to-year changes in the cash value. Taxes on real property are "to be collected by the counties and apportioned according to law to the districts within the counties." (Cal. Const., art. XIII A, § 1, subd. (a).) In keeping with this constitutional directive, the Legislature has provided in the Act: "An infrastructure financing district is a `district' within the meaning of Section 1 of Article XIII A of the California Constitution." (§ 53395.8.)

As noted above, tax increment financing is currently used throughout the state by redevelopment agencies to fund redevelopment projects. The courts have determined that under

this funding mechanism, redevelopment agencies do not levy property taxes. Rather, a redevelopment agency "passively receives the revenue from taxes levied by other agencies." (*Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 107.) The same would be true of an infrastructure financing district funding the construction of public facilities through tax increment financing. The district would not be imposing any taxes, but would receive a share of the taxes levied by other agencies that have the power to levy taxes on real property, that are engaged in that function at the time the infrastructure financing district is formed, and that have consented to the commitment of a portion of their revenues to the infrastructure financing district. Since no new ad valorem taxes on real property would be imposed by virtue of the creation of an infrastructure financing district, the Act's tax increment financing provisions would not violate article XIII A of the Constitution. **Footnote No. 5**

The other constitutional provision we must consider is article XVI, section 16, of the Constitution, adopted by the voters on November 5, 1952. This provision authorizes tax increment financing for redevelopment projects. Does the fact that the Constitution expressly authorizes tax increment financing for redevelopment projects have the effect of prohibiting the Legislature from authorizing such financing for any other purpose? We reject the suggestion for several reasons.

We first note that in 1952 the concept of community redevelopment through eminent domain proceedings followed by sale or lease to private individuals was the subject of litigation throughout the United States. (See *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 787-788.) Amending the Constitution to specifically allow tax increment financing for such blight clearance proceedings removed one potential for legal challenges in California.

Moreover, the 1952 constitutional provision clearly made the subject of tax allocation for redevelopment projects a matter of general statewide concern, thus controlling the allocation of tax revenues of a chartered city that would otherwise be subject to the control of the city's charter provisions. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 74.)

The 1952 constitutional amendment also removed the question whether the Legislature could force taxing agencies to accept a different allocation of their tax revenue at the election and determination of a city council. (See *In re Redevelopment Plan for Bunker Hill*, *supra*, 61 Cal.2d at 71-73.) Unlike the redevelopment law, the Act requires affected tax agencies to consent to the allocation of tax increment funds. (§ 53395.10, subd. (a).) Accordingly, the constitutional language authorizing tax increment financing of redevelopment projects addressed independent legal concerns unrelated to the Act's purposes or provisions.

Finally, and most importantly, we note that the Constitution is not a document that is to be generally regarded as granting specific powers to the Legislature. Rather, it provides a limitation on the powers of the Legislature. (*Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863, 868.) The rule of legislative primacy specifically in connection with taxation has long been acknowledged by the courts. In *Delaney* v. *Lowery* (1994) 25 Cal.2d 561, 568-569, the Supreme Court observed:

". . . Generally the Legislature is supreme in the field of taxation, and the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it. [Citations.] Its power in the field of taxation is limited only by constitutional restrictions. [Citations.] Those principles are a part of the broader concept that `. . . Our Constitution is not a grant of power but rather a limitation or restriction upon the powers of the Legislature. . . .' [Citation.] As a result constitutional restrictions on the power of the Legislature must be strictly construed against the limitation. We said in *Collins* v. *Riley*, supra, [24 Cal.2d] at 910:

"`If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations are to be construed strictly, and are not to be extended to include matters not covered by the language used.' That rule is a corollary of the strong presumption of the constitutionality of an act of the Legislature. [Citation.] Those principles indicate the latitude and effect to be given a legislative construction or interpretation of the Constitution. When the Constitution has a doubtful or obscure meaning or is capable of various interpretations, the construction placed thereon by the Legislature is of very persuasive significance. [Citations.]"

While section 16 of article XVI of the Constitution initially appears to be a grant of authority, it in fact limits the use of incremental tax financing in connection with redevelopment projects. For example, subdivisions (b) and (c) of section 16 specify the manner of allocating tax revenues and the purposes for which the redevelopment agency may use the revenues allocated to it. Subdivision (b) also terminates a redevelopment agency's right to receive tax allocations once it has paid off the loans and advances obtained to fund an agency's projects. Subdivision (c) prevents tax increment financing from affecting a taxing agency's funds attributable to a tax rate levied for the purpose of repaying certain bonded indebtedness. Thus, article XVI, section 16 constitutes a limitation on the use of tax increment financing in connection with redevelopment projects. As such, its limitation upon one particular use of such financing must be narrowly construed to not limit the Legislature's power to provide for incremental tax financing of other types of projects.

We conclude that nothing in the Constitution limits the Legislature's authority to authorize tax increment financing as set forth in the Act. A city or county may form an infrastructure financing district under which incremental increases in property taxes are allocated to finance public capital facilities associated with the district.

2. Delay in Formation of a District

The second question presented is whether facilities that have been partly or wholly constructed prior to formation of a district may be financed under the terms of the Act. We conclude that completed facilities may not be financed unless they are being purchased from another entity. Partly constructed facilities may be financed as specified in the Act.

As previously quoted, subdivision (a) of section 53395.3 authorizes a district to finance "the purchase . . . of any real or other tangible property," as long as "construction has been completed, as determined by the legislative body." Section 53395.4, subdivision (b) additionally provides:

"A district may finance only the facilities or services authorized in this chapter to the extent that the facilities or services are in addition to those provided in the territory of the district before the district was created. The additional facilities or services may not supplant facilities or services already available within that territory when the district was created but may supplement those facilities and services as needed to serve new developments."

In interpreting these statutes, we rely on well established principles of statutory construction. The words of a statute are to be given "their usual and ordinary meaning." (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601.) "Every word, phrase, and sentence in a statute should, if possible, be given significance. [Citation.]" (*Larson* v. *State Personnel Bd.* (1994) 28 Cal.App.4th 265, 276-277.) "'A statute must be construed "in the context of the entire statutory scheme of which it is a part, in order to achieve harmony among the parts."'" *(People* v. *Hull* (1991) 1 Cal.4th 266, 272.) "'[S]tatutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.'" *(Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268.)

As long as the facility is being "purchased," it may be completed at the time of purchase. Indeed, section 53395.3 requires that it be completed in order to be financed under the Act. Such a facility would not be constructed by the city; rather, it would be built by some other entity and "purchased" by the city.

As for facilities that are constructed by a city, they must not be "provided in the territory of the district before the district was created" in order to be financed under the Act's provisions. (§ 53395.4, subd. (b).) A facility that is still a work in progress has not been "provided." In this context, "provided" means that the facility has been furnished in completed form for use. (See Webster's Third New Internat. Dict. (1971) p. 1827.) However, an existing facility in need of expansion, improvement, seismic retrofit or rehabilitation may have such expansion, improvement, seismic retrofit or rehabilitation financed by the district. (§ 53395.3, subd. (a).)

We conclude in answer to the second question that if the formation of an infrastructure financing district is delayed until after the facilities to be financed are wholly or partially constructed, only those facilities that were not completed and provided by the city or county prior to formation of the district may be financed through incremental increases in property taxes.

\* \* \* \* \*

---

**Footnote No. 1**
All statutory references hereafter are to the Government Code unless otherwise designated.
**Footnote No. 2**
The public facilities that may be funded under the Act include highways, flood control channels, libraries, parks, and recreational facilities. (§ 53395.3, subd. (b).)
**Footnote No. 3**
"City" is defined to include a county or city and county. (§ 53395.1, subd. (b).)
**Footnote No. 4**
Section 53395.5 describes the costs associated with the removal of existing dwelling units, and section 53396.5 describes the costs incurred by a county in dividing the taxes pursuant to the terms of the Act.
**Footnote No. 5**
In *Huntington Park Redevelopment Agency* v. *Martin,* supra, 38 Cal.3d at 107, the Supreme Court rejected the

contention that a redevelopment agency levies taxes by participation in the tax allocation process, thereby becoming "special districts" for purposes of article XIII A of the Constitution.