Filed 9/25/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of KIMBERLEY CADY and VINCENT GAMICK. | B326716 |
| KIMBERLEY CADY, | (Los Angeles County Super. Ct. No. BD114645) |
| Appellant, | |
| v. | |
| VINCENT GAMICK, | |
| Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mark A. Juhas, Judge. Reversed in part and vacated in part.

Joel S. Seidel for Appellant.

Gary J. Cohen, APLC and Gary J. Cohen; Elkins Kalt Weintraub Reuben Gartside and Susannah Braffman Amen for Respondent.

——————————————

This appeal requires harmonizing two statutes that govern the financial responsibility of parents who have an adult child with significant disabilities. Family Code section 3910 makes the parents of an adult child "who is incapacitated from earning a living and without sufficient means" financially responsible for maintaining that child "to the extent of their abilit[ies]." (*Id.*, subd. (a).) Such adult children often receive certain types of government assistance, and Welfare and Institutions Code section 12350 states that "[n]o relative shall be held legally liable to support or to contribute to the support of any applicant for or recipient of [such] aid," and further that "[n]otwithstanding [s]ection[ ] 3910 . . . of the Family Code, . . . no demand shall be made upon any relative to support or contribute toward the support of any applicant for or recipient of [such] aid."

That leads to the following question: Does Welfare and Institutions Code section 12350 mean that an adult disabled child's application for or receipt of government aid bars one parent from seeking an order of child support from the other parent pursuant to Family Code section 3910? Our answer is no. The Legislature intended Welfare and Institutions Code section 12350 to prevent government actors from seeking reimbursement for the cost of government assistance from relatives of aid recipients. Because Welfare and Institutions Code section 12350 bars only the government from seeking contribution from relatives to defray the costs of such aid, it does not bar a parent from seeking a court order requiring the other parent to contribute to the support of an adult disabled child under Family Code section 3910.

Applied to the facts here, that means the family court erred in finding a father earning approximately $2 to $3 million a year

2

had no responsibility to help financially support his disabled adult son regardless of that child's need because the son received approximately $12,600 a year in government benefits subject to Welfare and Institutions Code section 12350. Based in part on its interpretation of the two statutes at issue, the family court also limited the needs-based attorney's fees awarded in favor of the child's mother and payable by the father. We vacate that fee award to permit the court to reconsider it in light of our reversal on the statutory interpretation issue.

## BACKGROUND

### A.      Factual Background

Schuyler Gamick is the adult son of divorced parents Kimberley Cady (Mother) and Vincent Gamick (Father).[1] Schuyler was born in 1990, has autism spectrum disorder, and receives services from the Regional Center. He receives government aid including Supplemental Security Income (SSI) and aid under the State Supplementary Program for Aged, Blind and Disabled (SSP; Welf. & Inst. Code, §§ 12000-12351).

### B.      Mother's Request for Order Seeking Support and Father's Response

#### 1.      *The Parties' Arguments, Evidence, and Stipulations*

On May 26, 2020, Mother filed a post-dissolution judgment request for order (RFO) for child support payable by Father. She alleged Schuyler was "incapable of earning a living" and "without sufficient means to support himself." Schuyler lived with Mother,

---

[1] We refer to Schuyler by his first name as he shares the same last name as Father. We do so for ease of reference, as is common in family law matters, and intend no disrespect.

3

who provided for his care and paid for all his expenses. Mother alleged that Father had not contributed to Schuyler's living expenses since 2009, although he did provide health insurance until Schuyler turned 26 years old. Mother also requested attorney's fees and costs pursuant to Family Code sections 2030 and 2032 to help her litigate support owed to Schuyler.

On January 14, 2021, Father filed his response. He argued Mother did not prove Schuyler was sufficiently incapacitated to qualify for child support, and if the court were inclined to grant child support, it should deviate from the guideline child support amount because the guideline support amount "would exceed Schuyler's needs." (Capitalization omitted.)

On January 25, 2021, in response to Father's claim that Schuyler could work, Mother submitted Schuyler's individual program plan from the Eastern Los Angeles Regional Center (ELARC), a psychological assessment report, and letters and declarations from, among others, Schuyler's sibling, the vice president of adult programs for an independent living skills program, a psychologist, and a service coordinator for ELARC attesting that Schuyler currently could not obtain and sustain a job. Father objected to much of Mother's evidence and identified two expert witnesses that he intended to call regarding opportunities for employment and workplace accommodations.

The evidentiary hearing for Mother's RFO was eventually scheduled for August 30, 2022. Mother's attorney first learned in early August 2022 that Father intended to argue that Welfare and Institutions Code section 12350 barred Mother from seeking child support payments related to Schuyler. Father did not seek to have the court make a dispositive ruling on the issue in

4

advance of the evidentiary hearing, and Mother did not advise the court of the issue.

Prior to the evidentiary hearing, the parties stipulated to the following: in 2014, Schuyler had been diagnosed with autism spectrum disorder; Schuyler received services from the Regional Center, SSI totaling $764.25 per month, CalFresh benefits of $279.50 per month, and Medi-Cal benefits; Mother's income was $5,449 per month; Father earned between $165,333 and $276,452 per month depending on the time period considered; and Father did not reside in California and did not pay California state income taxes. The parties continued to dispute whether Schuyler was incapacitated from earning a living and whether he had sufficient means to support himself.[2]

2. *The Evidentiary Hearing*

The court bifurcated Mother's RFO for child support from her request for attorney's fees and costs and proceeded first with the support request. Several witnesses testified, including a psychologist, a certified public accountant, and experts in the employability of persons with autism, vocational issues, and disability benefits.

Mother argued that Schuyler's disability made him unable to work or contribute to his own support, and that he did not have any meaningful assets. She observed that even with

---

[2] Approximately one month before the evidentiary hearing started, Father agreed to deposit $115,000 into a special needs trust for Schuyler's benefit, and Mother agreed that sum resolved all claims for Father's contribution to Schuyler's support or expenses through March 2022. Accordingly, the support sought by Mother at the hearing did not include that time frame.

government aid, she has had to support Schuyler financially. She asserted that under Family Code section 3910, Father should assist in providing child support for Schuyler and that the amount of support should be determined according to the child support guidelines. Mother further argued that the Legislature designed California's child support statutes to prevent an adult child from being "turned into the street" and becoming a public charge. Accordingly, private financial resources should be used to meet Schuyler's needs before resorting to government aid.

Father argued Schuyler could get a job and that under the Lanterman Developmental Disabilities Services Act (Lanterman Act; Welf. & Inst. Code, § 4500 et seq.), Schuyler was entitled "to an array of services and supports, which when coupled with his SSI/SSP and other benefits, by definition, provide sufficient means." Father also argued that Schuyler would lose his SSI payments and disability benefits if he received support under Family Code section 3910.

Father claimed that under Welfare and Institutions Code section 12350, neither parent was "legally obligated to support Schuyler or contribute to his support, or at least any support obligation [was] limited by Schuyler's SSI/SSP, Medi-Cal and Lanterman Act and other Welf[are and] Inst[itutions] Code benefits and rights, and, thus, [Mother]'s request must be denied." Father further argued that if the court found Family Code section 3910 applicable, use of the child support guidelines would be unjust or inappropriate and the court should deviate from them.[3]

---

[3] Father also argued that if Welfare and Institutions Code section 12350 was interpreted to permit child support payments,

6

### 3. *The Court's Ruling on Mother's RFO for Support*

On September 15, 2022, the court issued a tentative statement of decision. It held "that the broad and specific language of [Welfare and Institutions Code section] 12350 precludes the [c]ourt from ordering support under Family Code section 3910. As a result, the [c]ourt does not order [Father] to pay any support for the benefit of Schuyler. . . . Nevertheless, this [c]ourt recognizes the two statutes create ambiguity, which may be best resolved through legislative enactment or guidance from the Court of Appeal. [¶] Because of the nature of this ruling, the [c]ourt does not make any other findings in the case." On November 4, 2022, the court issued its final order, which set forth the same reasoning.

## C. **Mother's Request for Attorney's Fees**

### 1. *The Parties' Arguments Concerning Fees and Costs*

As mentioned previously, Mother's May 26, 2020 RFO also sought needs-based attorney's fees and costs pursuant to Family Code sections 2030 and 2032. While that RFO was pending, Father made payments to Mother in October 2020 and June 2021 totaling $37,500 subject to later allocation by the court and potential reimbursement.[4] Father agreed in July 2021 to

---

an equal protection issue would arise. Father has abandoned this argument on appeal.

[4] These amounts included Father's payment of $12,500 to Mother in October 2020. It is unclear if this amount was intended as a support payment or as a payment towards Mother's fees and costs, but the court did not characterize this payment as being for attorney's fees when it ultimately calculated the fee award.

7

contribute an additional $30,000 to Mother's fees and costs; Mother in return agreed that neither party could seek contribution for attorney's fees and costs incurred through July 27, 2021.

On October 19, 2022, Mother submitted pleadings in support of her request for fees and costs. She sought the entirety of her attorney's fees and costs incurred since July 23, 2021, which totaled approximately $148,804, and forensic accounting fees in the amount of $11,584. It is unclear why Mother sought fees and costs beginning on July 23, 2021, given that the parties' stipulation prohibited Mother from seeking fees and costs incurred through July 27, 2021. Mother argued that because Father contested that Schuyler was incapacitated from earning a living and without sufficient means, she had to develop and present evidence to prove each. Further, because Father was not forthcoming about his actual income at the beginning of the support dispute, Mother expended resources to identify and confirm Father's actual income before the parties were able to stipulate to his income.

Father argued the matter was over-litigated, causing him to incur over $200,000 in defense fees and costs, and that he had offered to settle the matter on at least three occasions, but Mother rejected each offer.[5] Father further observed he had

_____

[5] In May 2022, Father offered to pay $7,000 per month into the special needs trust and contribute an additional $30,000 to Mother's fees. In July 2022, Father raised his offer to $7,500 per month and contributing an additional $40,000 to Mother's fees. In August 2022, Father offered to contribute $45,000 for fees for an advocate to help obtain additional public services for Schuyler,

8

stipulated to Schuyler's developmental disabilities, and, therefore, Mother did not need to litigate that particular issue.

2. *The Court's Ruling on Mother's Request for Attorney's Fees and Costs*

By minute order on January 13, 2023, the trial court ruled on Mother's fees and costs request. The court noted Father already contributed $55,000 in attorney's fees and costs, that the issue at the center of the case (the applicability of Welfare and Institutions Code section 12350) was narrow, and that Father made several settlement offers which would have put resources at Schuyler's disposal. Mother rejected those offers and instead "chose a path that resulted in a significant expenditure of fees, without a positive result for Schuyler." The court wrote that although there was "no doubt that [Father] has the ability to pay his fees and contribute to [Mother]'s fees," and Mother "is able to seek redress in the [c]ourt system," she could not do so "at all costs, and then expect the wealthy [Father] to pay for both party's [*sic*] fees." The court awarded Mother an additional $20,000 in attorney's fees and costs, bringing the total Father contributed to Mother's fees and costs to $75,000.

---

as well as a one-time payment of $75,000 in the special needs trust, $1,000 per month into an account created under the Achieving a Better Life Experience Act of 2014 (see 26 U.S.C. § 529A), and to contribute further to Mother's fees.

9

# DISCUSSION

## A. Welfare and Institutions Code Section 12350 Does Not Absolve Father of His Duty Under Family Code Section 3910 to Support Schuyler

### 1. *Standard of Review and Principles of Statutory Construction*

We review issues of statutory construction de novo. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

" 'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] . . .' [Citation.] . . . [W]hen ' "two codes are to be construed, they 'must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they 'must be read together and so construed as to give effect, when possible, to all the provisions thereof.' [Citation.]" ' [Citation.] Further,

10

' " '[a]ll presumptions are against a repeal by implication. [Citations.]' [Citation.] Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' [Citation.]" ' [Citations.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.)

2. *The Two Statutes at Issue*

Family Code section 3910 describes parents' duty to support their incapacitated adult child. It states, in relevant part, "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means." (Fam. Code, § 3910, subd. (a).) This section derives from former Civil Code section 206. (23 Cal. Law Revision Com. com. (1993) p. 415, reprinted in West's Ann. Fam. Code (1994 ed.) foll. § 3910, p. 545.) "The purpose of [former Civil Code] section 206 [was] to protect the public from the burden of supporting a person who has a parent . . . able to support him or her." (*Chun v. Chun* (1987) 190 Cal.App.3d 589, 594.) Family Code section 3910 likewise "is ' "legislatively designed 'to protect the public from the burden of supporting a person who has a parent . . . able to support him or her.' [Citations.]" ' [Citations.]" (*In re Marriage of Cecilia & David W.* (2015) 241 Cal.App.4th 1277, 1286.)

11

Schuyler receives SSP benefits under chapter 3 of division 9 of the Welfare and Institutions Code (§§ 12000-12351).[6] Welfare and Institutions Code section 12350, also included in chapter 3, states, "No relative shall be held legally liable to support or to contribute to the support of any applicant for or recipient of aid under this chapter.  No relative shall be held liable to defray in whole or in part the cost of any medical care or hospital care or other service rendered to the recipient pursuant to any provision of this code if he is an applicant for or a recipient of aid under this chapter at the time such medical care or hospital care or other service is rendered.  [¶]  Notwithstanding [s]ections 3910, 4400, and 4401 of the Family Code,[7] or [s]ection

_____

[6] The trial court found, "There is no dispute that Schuyler is receiving aid under 'this chapter.' "  In a footnote in her brief, Mother now claims it is "unclear" whether and to what extent Schuyler receives SSP.  Mother does not, however, deny Schuyler receives such income, and substantial evidence supports the court's finding.  In California, recipients of SSI also receive SSP. (See Welf. & Inst. Code, § 12150; *Disabled & Blind Action Committee of Cal. v. Jenkins* (1974) 44 Cal.App.3d 74, 76, fn. 2 ["California has elected to pay SSP to all SSI recipients"].)  Here, letters from the Social Security Administration to Mother concerning a change in SSI paid to Schuyler state, "The new amount includes $164.24 from the State of California," which constitutes Schuyler's SSP benefit.

[7] Family Code section 4400 states, "Except as otherwise provided by law, an adult child shall, to the extent of the adult child's ability, support a parent who is in need and unable to self-maintain by work."  Family Code section 4401 makes binding "[t]he promise of an adult child to pay for necessaries previously furnished to a parent described in [Family Code s]ection 4400."

270c of the Penal Code,[8] or any other provision of this code, no demand shall be made upon any relative to support or contribute toward the support of any applicant for or recipient of aid under this chapter.  No county or city and county or officer or employee thereof shall threaten any such relative with any legal action against him by or in behalf of the county or city and county or with any penalty whatsoever."

      3.     *The Parties' Arguments*

Father argues the plain language of Welfare and Institutions Code section 12350 that "[n]otwithstanding" Family Code section 3910 "no demand shall be made upon any relative to support or contribute toward the support of any applicant for or recipient of aid under this chapter" expressly excepts him from any duty under Family Code section 3910 to support his son because Schuyler receives SSP.  He claims that a Law Revision Commission comment following Family Code section 3910 that refers to Welfare and Institutions Code section 12350, stating, "See also . . . Welf[are and] Inst[itutions] Code [section] 12350 (no liability for support or reimbursement of support to applicant for aid . . .)" (23 Cal. Law Revision Com. com., *supra*, at p. 415), further suggests the Legislature intended Welfare and Institutions Code section 12350 to abrogate Family Code section 3910 in situations where the adult incapacitated child receives

---

    **8** Penal Code section 270c states, "Except as provided in [c]hapter 2 (commencing with [s]ection 4410) of [p]art 4 of [d]ivision 9 of the Family Code, every adult child who, having the ability so to do, fails to provide necessary food, clothing, shelter, or medical attendance for an indigent parent, is guilty of a misdemeanor."

13

SSP. Father contends, "Had Schuyler refrained from applying for and receiving government aid, this appeal would not exist. However, he did. As a consequence, [Welfare and Institutions Code s]ection 12350 operates to relieve Schuyler's family—including [Father] and [Mother]—from having to contribute to Schuyler's support."

Mother argues Welfare and Institutions Code section 12350 does not relieve Father from his duty to contribute to Schuyler's support under Family Code section 3910. She contends that because the purpose of Family Code section 3910 is to insulate an adult incapacitated child from becoming a public charge, Father's interpretation of Welfare and Institutions Code section 12350 would lead to an absurd result. Rather than protect the public from the burden of supporting an adult child who has a parent able to support him or her, such an interpretation would absolve parents from any financial responsibility for their child despite their ability to pay support because that child receives government assistance.

4. *Welfare and Institutions Code Section 12350 Is Ambiguous*

We begin with the language of the statute, because when "legislative intent is expressed in unambiguous terms, we must treat the statutory language as conclusive; 'no resort to extrinsic aids is necessary or proper.' [Citation.]" (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 61.) When, on the other hand, "[s]tatutory language susceptible to more than one reasonable interpretation [it] is regarded as ambiguous—that is, it has no plain meaning." (*Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 925.)

14

Welfare and Institutions Code section 12350 is ambiguous. One can read it as Father does to state that it creates an exemption to Family Code section 3910, and bars claims for support by one parent against another pursuant to Family Code section 3910 when an adult disabled child applies for or receives SSP. However, Welfare and Institutions Code section 12350 is also susceptible to the interpretation that it bars only governmental actors from threatening or bringing legal action against relatives of aid recipients to seek reimbursement for the cost of such aid. For example, the statute prohibits cities, counties, and their officers and employees from threatening relatives of aid recipients with legal action "by or in behalf of the county or city and county" (Welf. & Inst. Code, § 12350), but not any other persons. This specific identification of who is barred from threatening legal action suggests the section's related prohibition on following through with such threats is similarly limited only to those identified government actors.

5. *History of California Law Concerning Relative Responsibility*

Because Welfare and Institutions Code section 12350 is ambiguous, we turn to "other aids, such as the statute's purpose, legislative history, and public policy" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles*, *supra*, 34 Cal.4th at p. 737), along with such aids for Family Code section 3910 and its interplay with Welfare and Institutions Code section 12350.

As we explain next, Family Code section 3910 is the current iteration of a long-standing legislative policy to alleviate the burden on the public of caring for needy persons by requiring certain relatives who can support their own family members in fact do so. Historically, those efforts included a related ability of

15

the government to pursue relatives for reimbursement of government aid provided to persons in need, based on the view that such relatives were responsible in the first instance for providing for their family members.  In 1961, California began to abandon that reimbursement approach and to start barring such government collection efforts.  Properly understood in light of history, public policy, and legislative intent, Welfare and Institutions Code section 12350 bars such government collection efforts but does not erase a history that stretches back to the Elizabethan era of parents having not only a moral but also a legal obligation to support adult children in need.

### a.  Origins of Relative Responsibility

In 1964, Professor Jacobus tenBroek described California as having a "dual system of family law."[9]  (See Jacobus tenBroek, California's Dual System of Family Law: Its Origin, Development, and Present Status Part I (1964) 16 Stan. L. Rev. 257 (tenBroek, Part I); Jacobus tenBroek, California's Dual System of Family Law: Its Origin, Development, and Present Status Part II (1964) 16 Stan. L. Rev. 900 (tenBroek, Part II); Jacobus tenBroek, California's Dual System of Family Law: Its Origin, Development, and Present Status Part III (1965) 17 Stan. L. Rev. 614 (tenBroek, Part III).)  Generally speaking, one system (now contained mostly in the Welfare and Institutions Code) concerns itself with the relationship between families and the government.  The other, set forth initially in the Civil Code and later in the Family Code once it was enacted in 1992, governs the

---

[9] Our Supreme Court cited Professor tenBroek's discussion of the development of family law as " 'excellent.' "  (*Swoap v. Superior Court* (1973) 10 Cal.3d 490, 505.)

16

relationship between family members themselves.  (tenBroek, Part I, *supra*, at pp. 257-258; Stats. 1992, ch. 162, §§ 2, 10, p. 464.)

As relevant here, both systems derived to some degree from the Elizabethan poor laws, which established "the principle of public responsibility to maintain the destitute."  (tenBroek, Part I, *supra*, at p. 262.)  To reduce the public cost of supporting the poor, the Elizabethan poor law made relatives legally liable for supporting their poor kinsmen.  (tenBroek, Part I, *supra*, at p. 283.)  As written in 1601, the law required that the parents, grandparents, and children of "everie poore olde blind lame and impotente p*er*son, or other poore p*er*son not able to worke, beinge of a sufficient abilitie, shall at their owne Chardges releive and maintain everie suche poore p*er*son, in that manner and accordinge to" a rate set by a justice of the peace. (*Ibid*.)  The law additionally provided for a fine for any failure to comply.  (*Ibid*.)

This concept found its way to California via the state of New York.  In 1788, New York adopted the relative responsibility provisions of the Elizabethan poor law with little change. (tenBroek, Part I, *supra*, at p. 294, citing N.Y. Sess. Laws 1788, ch. 62; 1 N.Y. Rev. Stats. (2d ed. 1835) ch. XX, tit. 1, at pp. 621-640.)  In 1865, New York incorporated this concept of relative responsibility into its draft Field Codes.  (tenBroek, Part I, *supra*, at pp. 294, 296.)

The Field Code drafters created five codes for the state of New York, including a Political Code, a Penal Code, and a Civil Code.  (tenBroek, Part I, *supra*, at p. 308.)  "The Civil Code encompassed 'the law of civil rights and obligations affecting all the transactions of men with each other in their private relations' and contained divisions dealing with persons, property, and

17

obligations.  The organizational pattern is important: the distribution among the codes of the branches of family law reveal the understanding which the Field Code drafters had of its nature.  The poor law, including the family law of the poor, was allocated to the Political Code and the Code of Criminal Procedure.  The poor law was not regarded as dealing with the rights and relations of persons among themselves; it was not part of the private, civil law of persons.  It was defined in terms of the functions of public officers and therefore placed in the Political Code and in terms of the procedures by which those officers might govern the poor and their relatives and therefore placed in the Code of Criminal Procedure.”  (tenBroek, Part I, *supra*, at pp. 308-309, fn. omitted.)  The Code of Criminal Procedure likewise included provisions concerning responsible relatives of the poor, including procedures for “summoning the relatives, determining amounts of payment, distributing the burden among them, reviewing the orders and enforcing the payment, and seizing and selling the property of absconding parents and husbands and applying the income to the maintenance of children and wives.” (*Id*. at p. 310.)

“While maintaining the separation of poor law and civil law, the [code] commissioners drew from the poor law one of its principal features, responsibility of relatives for the support of their poor kinsmen, and placed it in the Civil Code.” (tenBroek, Part I, *supra*, at pp. 311-312.)  “[T]he commissioners explained: ‘the provisions of the Poor Laws declare the duty of parents and children to support each other . . . .’  ‘It is the object of this section to recognize the obligation as a ground of legal liability *independent* of those provisions.’ ” (tenBroek, Part I, *supra*, at

pp. 311-312, citing Draft N.Y. Civ. Code, § 97, Comm'rs' Note, italics added, fn. omitted.)

In drafting the California codes, our code commissioners and legislators considered New York's dual system of family law. (tenBroek, Part I, *supra*, at p. 317.) The five Field Codes were embraced within four California Codes—a Code of Civil Procedure, a Penal Code, a Political Code, and a Civil Code—to varying degrees. (tenBroek, Part II, *supra*, at pp. 900-901.) "Of the four codes adopted by California in 1872, the one which copied most from the Field draft . . . is the Civil Code. . . . In that part of the family law[,] . . . [concerning] the law of the child as it touches on his relations with his parents, on public programs and private charities, and on third persons generally[,] the Field draft was accepted practically as it stood, . . . with its elaboration of the reciprocity of parental rights and responsibilities, . . . [and] with its single section declaring the general responsibility of relatives after the manner of the poor law." (tenBroek, Part II, *supra*, at pp. 904-905, fns. omitted.) At the time of its enactment in 1872, Civil Code section 206 stated, " 'It is the duty of the father, the mother, and the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability. The promise of an adult child to pay for necessaries previously furnished to such parent is binding.' " (*County of San Bernardino v. Simmons* (1956) 46 Cal.2d 394, 396.)

New York's poor law system, derived from the Elizabethan poor law system, "was omitted from the codes adopted in California in 1872." (tenBroek, Part II, *supra*, at p. 906.) However, by the Pauper Act of 1901, California "enacted [the Elizabethan poor law system]," which "included a state-imposed,

19

county-financed, county-administered duty to relieve the poor, . . . and legal liability of an array of relatives for the support of their destitute kinsmen." (tenBroek, Part II, *supra*, at p. 939, citing Stat. 1901, ch. CCX.) "Payments by [liable relatives] were to be made to the county treasury quarterly and in advance, and enforcement was to be by judicial proceedings instituted by the district attorney and conducted as all other 'actions for the recovery of money.' " (*Id*. at p. 940, fn. omitted, citing Stat. 1901, ch. CCX, §§ 6, 7.)

b.      1929:  California Aid Programs

In 1929, the Legislature enacted a program for "aid in old age" for any person at least 70 years old who had "no children or other person able to support him and responsible under the law of this state for his support" and whose income and assets were below a certain threshold.  (Stats. 1929, ch. 530, §§ 1, 2, 3, 4, p. 914; see also *County of Los Angeles v. La Fuente* (1942) 20 Cal.2d 870, 874; tenBroek, Part II, *supra*, at p. 935.)  Under the law, a county providing aid could require the recipient to transfer his or her property to the county as security for the aid advanced. (See Stats. 1929, ch. 530, § 9, p. 916; see also *County of Los Angeles v. La Fuente*, *supra*, at p. 874.)  Additionally, if the recipient or their spouse obtained property in excess of a threshold amount, the government could recover any excess aid paid.  (Stats. 1929, ch. 530, § 10, p. 916.)  In describing this law, our Supreme Court observed, "the Legislature gave the county no right to reimbursement against a responsible relative, for if the applicant had such a relative[,] he was not entitled to benefits. The statute apparently contemplated that an aged person, neglected by a responsible relative, should enforce that liability

20

by legal action.  (Civ. Code, § 206 . . . .)"  (*County of Los Angeles v. La Fuente*, *supra*, at p. 874.)

The Legislature also enacted a program for aid to " 'needy blind persons.' "  A blind person was eligible for aid if, among other things, his total yearly income including the aid award fell below a certain threshold, he was "unable to provide himself with the necessities of life," did not have "sufficient means of his own to maintain himself," and did not have "any relatives[ ] responsible for his support under the laws of this state, who have sufficient income to pay a tax under the provisions of the federal income tax law."  (Stats. 1929, ch. 529, §§ 2, 3, 5, pp. 910, 911-912.)

c.    1937-1941:  Welfare and Institutions Code

In 1937, the Legislature enacted the Welfare and Institutions Code, "thereby consolidating and revising the law relating to and providing for protection, care, and assistance to children, aged persons, and others specially in need thereof." (Stats. 1937, ch. 369, p. 1005, italics omitted.)  It provided for, among other things, aid to the aged "if in need" (Stats. 1937, ch. 369, p. 1078; see Welf. & Inst. Code, former §§ 2000-2228 [Old Age Security Law]) and aid to the needy blind (Stats. 1937, ch. 369, p. 1102; see Welf. & Inst. Code, former §§ 3000-3091).

The 1937 law permitted the government to seek reimbursement of aid from financially able responsible relatives. For the aged, former Welfare and Institutions Code section 2224 stated, "If the person receiving aid has within the [s]tate a spouse or adult child pecuniarily able to support said person, the board of supervisors shall request the district attorney or other civil legal officer of the county granting such aid to proceed against the kindred in the order of their responsibility to support. . . .

21

Any sum so recovered shall be credited by the county to the county and to the [s]tate in proportion to the contributions of the county and the [s]tate respectively." (Stats. 1937, ch. 369, p. 1094, effective Sept. 1, 1937; see Stats. 1937, ch. 369, p. 1084; see also Welf. & Inst. Code, former § 2160, subd. (f) [aged person "receiving adequate support, from a husband, wife, or child, able and responsible under the law of this [s]tate to furnish such support" was not eligible for aid].)

Likewise, under former Welfare and Institutions Code section 3088, if an aid recipient who was blind had a spouse, parent, or adult child able to support the recipient but who had failed "to perform their duty to support," the county could "maintain an action" "against such relatives, in the order named, to recover for the county such portion of the aid granted as the court finds such relative or relatives pecuniarily able to pay." (*Ibid.*; amended by Stats. 1937, ch. 406, pp. 1114-1115.)

In 1941, the Legislature amended Welfare and Institutions Code section 2181, relating to aid to the aged, to establish that "[t]he maximum degree of liability of the responsible relative shall be determined by 'Relatives' Contribution Scale,' " a matrix that took into account the responsible relative's income and dependents. (Stats. 1941, ch. 1254, § 1, pp. 3198-3199.) It also amended Welfare and Institutions Code section 2224 to authorize counties granting aid to maintain actions against the responsible relatives "to secure an order requiring the payment of any sums which may become due in the future for which the relative may be liable." (Stats. 1941, ch. 1254, § 2, pp. 3199-3200.)

22

d.    <u>1940s and 1950s:  Judicial Response to the Potential Overlap of Civil Code Section 206 and the Welfare and Institutions Code</u>

In the 1940s, the judiciary acknowledged that both the Welfare and Institutions Code and Civil Code section 206 addressed responsible relatives' liability and attempted to harmonize the two.  (See, e.g., *County of Lake v. Forbes* (1941) 42 Cal.App.2d 744, 746 [concluding Welf. & Inst. Code, § 2224, and not Civ. Code, § 206 governed lawsuit by county]; contra *Garcia v. Superior Court* (1941) 45 Cal.App.2d 31, 33-34 [reading Civ. Code, § 206 as establishing a duty and the Welf. & Inst. Code as establishing the collection procedure], disapproved on another ground in *County of San Bernardino v. Simmons*, *supra*, 46 Cal.2d at p. 399.)

In the 1950s, our Supreme Court twice had occasion to consider the respective roles of Civil Code section 206 and the Welfare and Institutions Code in county-initiated lawsuits.  In *County of Contra Costa v. Lasky* (1954) 43 Cal.2d 506, the court stated, "There is a conflict in the cases as to whether the basic liability of responsible relatives is section 206 of the Civil Code or the provisions of the Welfare and Institutions Code.  It has been held that the latter code provisions are complete in themselves and the liability of responsible relatives to the county is thereby established.  [Citations.]  Although it is not important in this case, we believe the matter is adequately covered by the Welfare and Institutions Code and it is the measure of the extent of the responsible relative's liability to the county.  It is to it we must look to ascertain whether the relative is required, in a particular case, to reimburse the county."  (*Id*. at p. 509.)

In 1956, the Supreme Court held a county could not sue responsible relatives to recover for aid to the aged derivatively under Civil Code section 206. (*County of San Bernardino v. Simmons*, *supra*, 46 Cal.2d at p. 396.) "The Welfare and Institutions Code sets out what appears on the face of that code to be a complete procedure for recovery by the county, when it pays aid to a needy aged person, from a spouse or adult child who is able to support the aged person." (*Ibid*., fn. omitted.) The court concluded, "There is nothing in [Civil Code] section 206 which suggests an intention to create a liability of the child of poor parents to public agencies which support the parents in accord with their law-imposed duty to pay aid to such parents . . . . On the other hand, the Welfare and Institutions Code (particularly . . . [sections] 2181 [and] 2224 . . .) not only purports to state the circumstances in which the named responsible relatives are liable to the county when it has supported or paid aid to indigents, aged, blind, etc., but also states a procedure by which in proper cases the county can recover from the responsible relatives. It seems apparent, therefore, that the Legislature intended, by the Welfare and Institutions Code, to cover completely the subject of recovery by public agencies from responsible relatives, and that it did not intend to create, and that there is no proper basis for the courts to innovate, a right of recoupment derived from section 206 of the Civil Code." (*Id*. at p. 398, fn. omitted.)

> e. 1957: Amendments to Welfare and Institutions Code to Include Aid to the Needy Disabled

In 1957, the Legislature amended the Welfare and Institutions Code to provide aid to the " 'needy disabled.' " (Stats. 1957, ch. 2411, § 2, pp. 4156-4157; see Welf. & Inst. Code, former

§§ 4000-4192.) To be eligible for aid, a person with disabilities had to be at least 18 years old and could not be "receiving adequate support from a husband or wife, or parent, or child able and responsible under the laws of this State to furnish such support." (Welf. & Inst. Code, former § 4160, subds. (a), (f); Stats. 1957 ch. 2411, § 2, p. 4160.) Mirroring substantially the similar provisions relating to aid to the aged and blind, former Welfare and Institutions Code section 4189 stated: "If any applicant receiving aid under the provision of this chapter has a spouse, parent, or adult child, pecuniarily able to support him, either in whole or in part, upon the failure of such kindred to perform their duty to support the disabled person the board of supervisors shall request the district attorney or other civil legal officer of the county to proceed against the kindred in the order named. [¶] Upon such request the district attorney, or other civil legal officer of the county granting aid may, on behalf of the county, maintain an action in the superior court of the county granting such aid, against such relatives, in the order named: (1) to recover for the county such portion of the aid granted as the courts find such relative or relatives pecuniarily able to pay and (2) to secure an order requiring the payment to the county of any sums which may become due in the future for which the relative may be liable." (Stats. 1957, ch. 2411, § 2, pp. 4162-4163.)

    f. <u>1961: The Legislature Repeals Relative Responsibility for Aid for the Blind and Disabled</u>

In 1961, following then-Governor Edmund G. Brown's recommendation and pursuant to Senate Bill No. 135 and

Assembly Bills Nos. 729 and 730,[10] the Legislature repealed the following relatives' responsibility provisions of the Welfare and Institutions Code: section 3088 (blind), section 3474 (potentially self-supporting blind), and section 4189 (disabled).  (Stats. 1961, ch. 1996, § 5, p. 4206; Stats. 1961, ch. 1996, § 2, p. 4207; Stats. 1961, ch. 1998, § 1, p. 4210.)  The "[r]esponsibility of relatives provisions, invented and always sustained to cut the costs of public welfare, were abolished in California's blind and disabled programs because of increasing popular and professional opinion that they are not fiscally productive, [were] disruptive of family relations and rehabilitation plans, and ha[d] other socially undesirable consequences."  (tenBroek, Part III, *supra*, at p. 679.)

In their place, the Legislature enacted Welfare and Institutions Code former sections 3011, 3411, and 4011.  (Stats. 1961, ch. 1995, § 1, p. 4205; Stats. 1961, ch. 1996, § 1, pp. 4206-4207; Stats. 1961, ch. 1998, § 2, p. 4211.)  Similar to today's Welfare and Institutions Code section 12350, these sections

---

[10] Governor Brown's recommendation stated the following: "This bill will eliminate the requirement that relatives must support disabled persons who qualify for aid under the Aid to Needy Disabled program.  For the most part, recipients of aid under this program are suffering from extreme illnesses and disabilities which require considerable attention and care from their relatives.  It is expected that relatives will continue to extend this care to these disabled persons regardless of their legal liability.  However, many relatives have had to do so with great deprivation to themselves and to other members of the family who have a responsibility.  The bill will relieve them of the legal force of the responsible relatives support law."  (Governor's message to Leg. on Sen. Bill No. 135 (May 9, 1961) Assem. J. (1961 Reg. Sess.) at p. 5690.)

stated, "No relative shall be held legally liable to support or to contribute to the support of any applicant for or recipient of aid under this chapter.  No relative shall be held liable to defray in whole or in part the cost of any medical care or hospital care or other service rendered to said recipient pursuant to any provision of this code if he is an applicant for or a recipient of aid under this chapter at the time such medical care or hospital care or other service is rendered.  [¶]  Notwithstanding the provisions of [s]ection 206 of the Civil Code, or [s]ection 270c of the Penal Code, or any other provision of this code no demand shall be made upon any relative to support or contribute toward the support of any applicant for or recipient of aid under this chapter. No county or officer or employee thereof shall threaten any such relative with any legal action against him, by or in behalf of the county or with any penalty whatsoever."  (See Welf. & Inst. Code, former §§ 3011, 3411, 4011.)

However, the 1961 amendments did not relieve relatives of recipients of aid to the aged from contributing to their support. (See Stats. 1961, ch. 1997, §§ 1-2, pp. 4208-4210; see Welf. & Inst. Code, former §§ 2181, 2181.06, 2224.)  Welfare and Institutions Code former section 2224, amended by Statutes 1961, chapter 1997, section 2, stated, in part, "If an adult child living within this State fails to contribute to the support of his parent as required by [s]ection 2181, the county granting aid under this chapter may proceed against such child.  Upon request to do so the district attorney or other civil legal officer of the county may maintain an action, in the superior court of the county granting such aid, to recover that portion of the aid granted as it is determined that the child is liable to pay, and to secure an order requiring payment of any sums which may become due in the

27

future."  Still, the Legislature "alter[ed] the figures in the liability table to exempt roughly [97] per[]cent of the relatives obligated to make payments."  (tenBroek, Part III, *supra*, at p. 635, fn. omitted.)

### g.    Equal Protection Challenges and Legislative Response

In *County of San Mateo v. Boss* (1971) 3 Cal.3d 962,[11] the Supreme Court addressed equal protection challenges to then-Welfare and Institutions Code section 12100, which permitted a county to proceed against an adult child for aid to an aged relative, and to then-Welfare and Institutions Code section 12101, which established the responsible relative's maximum monthly contribution.  The court explained that in a related context the costs to the government for care of a mentally ill parent could be charged to a person who had a preexisting duty to support the recipient.  (*County of San Mateo v. Boss*, *supra*, at p. 969.)  The county had argued that Civil Code section 206 was such a preexisting duty and provided a rational basis for the imposition of relative responsibility under the Welfare and Institutions Code for the needy aged.  (*County of San Mateo v. Boss*, *supra*, at p. 969.)  The court, however, found the facts did not show that the adult child's mother was a " 'poor person' " and he thus owed her no duty of support under Civil Code section 206.  (*County of San Mateo v. Boss*, *supra*, at p. 969.)  The court did not reach the issue of whether the duties imposed by Welfare and

---

[11] *County of San Mateo v. Boss*, *supra*, 3 Cal.3d 965 was later overruled by *Swoap v. Superior Court*, *supra*, 10 Cal.3d at page 502, footnote 10.

28

Institutions Code former sections 12100 and 12101 had a rational basis.  (*County of San Mateo v. Boss*, *supra*, at p. 971, fn. 8.)

In 1971, in response to *County of San Mateo v. Boss*, the Legislature amended Civil Code section 206.  (See *Swoap v. Superior Court*, *supra*, 10 Cal.3d at p. 499; Stats. 1971, ch. 578, § 3.)  The 1971 amendments substituted the phrase "person in need" for the phrase "poor person" in the first sentence and added a third sentence that, "A person who is receiving aid to the aged shall be deemed to be a person in need who is unable to maintain himself by work."  (Stats. 1971, ch. 578, § 3, p. 1137.)  Thus, "[b]y virtue of this amendment, all adult children of persons receiving aid to the aged have a duty of support under Civil Code section 206."  (*Swoap v. Superior Court*, *supra*, 10 Cal.3d at p. 499.)  The Legislature amended the Welfare and Institutions Code, including adding section 12101.1, which stated, "Relatives' contributions under [s]ection 12101 shall be paid to the county department and be treated by the county as recoveries on aid granted."  (Welf. & Inst. Code, § 12101.1; Stats. 1971, ch. 578, § 34, p. 1169.)

In 1973, the Supreme Court again considered equal protection challenges to then-Welfare and Institutions Code sections 12100 and 12101 and determined they were constitutional.  (*Swoap v. Superior Court*, *supra*, 10 Cal.3d at p. 493.)  The court further held that relative responsibility obligations under the Welfare and Institutions Code "are entirely independent of Civil Code section 206, and that the right of the county granting aid to the aged 'to recover that portion of the aid granted as it is determined that the child is liable to pay' [citation] is created solely by the pertinent sections of the Welfare and Institutions Code and does not devolve upon the county by

29

subrogation of any right which the parent may have against the child under Civil Code section 206.  It is manifest, then, that the liability of the child now being subjected to constitutional scrutiny is that imposed by [the relative responsibility sections] in themselves.  It is equally clear that the rationality of the basis for such liability does not and should not depend upon the exact subrogation of an individual duty, factually established, under Civil Code section 206." (*Swoap v. Superior Court*, *supra*, 10 Cal.3d at p. 502, italics omitted.)  After explaining that Civil Code section 206 itself derives from "a long tradition of law, not to mention a measureless history of societal customs," the court concluded, "[a] rational basis for such classification is found in, and provided by, Civil Code section 206, which itself rests soundly on our Anglo-American legal tradition."  (*Swoap v. Superior Court*, *supra*, at pp. 503, 507.)

h.    1973-1974:  SSP and Restructuring the Welfare and Institutions Code

"The 1972 Congress substantially changed the system of paying welfare to needy adults. . . .  This new system, known as the [SSI] program, guarantee[d] a monthly federal payment to needy blind, aged and disabled persons.  Unlike payments under the former [federal] grant-in-aid programs, an individual's eligibility for SSI payments d[id] not depend upon state action, since the program is fully administered by the Social Security Administration under nationwide standards.  [¶]  The federal SSI payment is less than the amounts which many of the states paid under the former grant-in-aid programs.  For that reason, Congress invited the states to pay additional moneys to SSI recipients (42 U.S.C. § 1382e(a).)  These additional payments are

called [SSP]." (*Disabled & Blind Action Committee of Cal. v. Jenkins, supra,* 44 Cal.App.3d at p. 76, fn. omitted.)

In 1973, the Legislature restructured the Welfare and Institutions Code to, among other things, group together the state supplementary program for the aged, blind, and disabled in a new chapter 3. (Stats 1973, ch. 1216, § 37, p. 2903; see Welf. & Inst. Code, former §§ 12000-12600; *Disabled & Blind Action Committee of Cal. v. Jenkins, supra,* 44 Cal.App.3d at p. 77 ["Chapter 3 (Old Age Security), chapter 4 (Aid to the Blind), and chapter 6 (Aid to the Needy Disabled), all were repealed; and in their place a new chapter 3 was enacted, dealing with all three categories"].)

Although chapter 3 concerned aid to all three groups, article 8, entitled "Relatives' Responsibility," and beginning with a section 12350 of the Welfare and Institutions Code, seemed to only address aid to the aged. As of this time, Welfare and Institutions Code section 12350 stated, in part, "If an adult child living within this state fails to contribute to the support of his parent as required by [s]ection 12351, the state may proceed against such child. Upon request to do so, the attorney general may maintain an action in the superior court of the county of residence of the responsible relative, to recover that portion of the aid granted as it is determined that the child is liable to pay, and to secure an order requiring payment of any sums which may become due in the future." (*Id.,* former § 12350; Stats 1973, ch. 1216, § 37, p. 2912.)

In 1974, the Legislature added Welfare and Institutions Code section 12361 to clarify that article 8 did not apply to the relatives of applicants or recipients of aid to the blind or disabled. (Stats. 1974, ch. 75 § 10, p. 168; see Welf. & Inst. Code, former

31

§ 12361.)  Thus, the Legislature confirmed the continuity of the policy that began in 1961 not to hold relatives of such aid recipients financially liable for the cost to the government of the recipient's support.

### i. 1975:  Legislature Repeals Relative Responsibility for Aid to the Aged

Although relative responsibility for aid to the aged continued, support for this approach diminished and skepticism arose regarding the rationale for pursuing such claims against adult children.  (E.g., Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 46 (1975-1976 Reg. Sess.) Sept. 18, 1975, pp. 1-2; Health and Welfare Agency, Enrolled Bill Rep. on Sen. Bill No. 46 (1975-1976 Reg. Sess.) Sept. 18, 1975, p. 2.)  "Court challenges and legislative efforts to amend and repeal the law questioned whether it violated the due process rights of the contributing adult children . . . and whether the detrimental effect on family relationships outweighed fiscal benefits to the state."  (Comment, *Domestic Relations* (1976) 7 Pacific L.J. 411, 420.)  "[O]nly one out of every six potentially liable adult children actually contributed under the [Relatives' Responsibility] Act.  In addition[, there were claims] that the state agencies collecting the contributions under the law resorted to illegal acts (such as sending threatening letters to elderly welfare recipients to obtain the names of their children) in their collection efforts."  (*Id.* at p. 421; see also Health and Welfare Agency, Enrolled Bill Rep. on Sen. Bill No. 46, *supra*, p. 4 [referring to the relatives' responsibility program as inequitable and unfair]; Assem. Ways and Means Com., Analysis for Sen. Bill No. 46 as amended Aug. 14, 1975, p. 2 [describing enforcement difficulties].)

Thus, in 1975, pursuant to Senate Bill No. 46, the Legislature repealed article 8 of the Welfare and Institutions Code and added a new article 8, including a new Welfare and Institutions Code section 12350. (Stats 1975, ch. 1136, §§ 1, 2, p. 2811.) Welfare and Institutions Code section 12350 was amended to state, "No relative shall be held legally liable to support or to contribute to the support of any applicant for or recipient of aid under this chapter. No relative shall be held liable to defray in whole or in part the cost of any medical care or hospital care or other service rendered to the recipient pursuant to any provision of this code if he is an applicant for or a recipient of aid under this chapter at the time such medical care or hospital care or other service is rendered. [¶] Notwithstanding the provisions of [s]ection 206 of the Civil Code, or [s]ection 270c of the Penal Code, or any other provision of this code, no demand shall be made upon any relative to support or contribute toward the support of any applicant for or recipient of aid under this chapter. No county or city and county or officer or employee thereof shall threaten any such relative with any legal action against him by or in behalf of the county or city and county or with any penalty whatsoever." (Stats 1975, ch. 1136, § 2, p. 2812.)

Notably, an enrolled bill report for Senate Bill No. 46[12] observed this amendment "does not alter the fundamental state

---

[12] " 'While enrolled bill reports prepared by the executive branch for the Governor do not necessarily demonstrate the Legislature's intent [citation], they can corroborate the Legislature's intent, as reflected in legislative reports, by reflecting a contemporaneous common understanding shared by

policy[ ] that able adult children should assist in the support of their needy aged parents, as that requirement remains untouched in Civil Code Section 206.  The bill simply removes the state's authority to be involved in what is essentially a family matter."  (Health and Welfare Agency, Enrolled Bill Rep. on Sen. Bill No. 46, *supra*, p. 4; see also *id*., p. 3 ["The duty of children to support their parents who are 'in need' (Civil Code [section] 206) is not changed by this bill"].)

> j.       1992:  Enactment of the Family Code

In 1992, the Legislature enacted the Family Code.  (Stats. 1992, ch. 162, § 10, p. 464.)  In doing so, it repealed Civil Code section 206 and placed the provisions previously contained therein into Family Code sections 3910 (support of an adult incapacitated child), 4400 (support of parents), and 4401 (promise of adult child to pay for necessities).  (Stats. 1992, ch. 162, §§ 2, 10, pp. 464, 580, 596.)  Family Code section 3910 no longer used the phrase "in need" that had appeared in Civil Code section 206.  Rather, it stated, "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means."  (Fam. Code, § 3910, subd. (a).)  The Law Review Commission Notes stated, "See also . . . Welf[are and] Inst[itutions] Code [section] 12350 (no liability for support or reimbursement of support to applicant for aid under Burton-Moscone-Bagley Citizens' [Income] Security Act for Aged, Blind

---

participants in the legislative process from both the executive and legislative branches.' [Citation.]"  (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 41, italics omitted.)

and Disabled Californians)." The Legislature also amended Welfare and Institutions Code section 12350 to replace the reference to Civil Code section 206 with references to Family Code sections 3910, 4400, and 4401. (Stats. 1992, ch. 163, § 153, p. 839.)

6. *This Legislative History Demonstrates Welfare and Institutions Code Section 12350's Prohibition Is Limited to Government Efforts to Recover the Cost of Aid Provided to Recipients*

The above history shows Family Code section 3910 maintains our state's longstanding policy to alleviate the burden on the public of caring for needy persons by making sure certain identified relatives shoulder that burden in the first instance where financially able to do so. Father acknowledges that Family Code section 3910 restated, without substantive change, former Civil Code section 206's requirement that parents maintain their adult incapacitated child and "simply represent[s] a new arrangement of the provisions of former Civil Code section 206." (See 23 Cal. Law Revision Com. com., *supra*, at p. 415.) This history also establishes that Welfare and Institutions Code section 12350 arose from a legislative policy decision to stop imposing liability on relatives for pre-payment or repayment of government aid given to those relatives' family members, and is confined to that purpose.

The provenance of these statutes further demonstrates that properly construed they do not conflict. The Welfare and Institutions Code developed to address the relationship between the government and families, while the Family Code derived from laws that governed the relationship between family members themselves. (See tenBroek, Part I, *supra*, at pp. 257-258.) Here,

35

Family Code section 3910 permitted Mother to seek contribution from Father to help pay for the support of their adult disabled child. Welfare and Institutions Code section 12350 did not insulate Father from his financial responsibilities to Schuyler simply because his son was receiving SSI/SSP and services subject to that section; Father has a legal obligation to provide necessary support if he is financially able to do so regardless of such aid. Welfare and Institutions Code section 12350 operates only to protect Father from a lawsuit by state government actors for recoupment of the SSI/SSP paid to Schuyler.

7.    *Case Law Construing Welfare and Institutions Code Section 12350 Supports this Interpretation*

*County of Ventura v. Stark* (1984) 158 Cal.App.3d 1112 (*Stark*) supports this interpretation of the two statutes at issue. In *Stark*, a disabled minor resided in a care facility paid for by the Social Security Administration and the County of Ventura. (*Id*. at p. 1115.) The county's contribution was comprised of aid paid under (now former) Aid to Families with Dependent Children (AFDC; Welf. & Inst. Code, former § 11200 et seq.) as well as aid paid under the aged, blind, and disabled (ABD) program (the same program under which Schuyler receives SSP). The county sought reimbursement for the amounts it paid under AFDC, which, at the time, it was entitled to do under then-Welfare and Institutions Code section 11350. The minor's mother argued Welfare and Institutions Code section 12350 relieved her of any obligation to reimburse the county for such AFDC aid. (*Stark*, *supra*, at p. 1115.)

The court determined that "the prohibitions of [Welfare and Institutions Code] section 12350 are limited to *aid* under the ABD program, and *services* under any provision of the Welfare

36

and Institutions Code." (*Stark, supra*, 158 Cal.App.3d at p. 1116.) It reasoned, "It makes no sense for the Legislature to enact a detailed procedure for enforcement of child support obligations in chapter 2 (AFDC) only to abolish its collection in chapter 3," pursuant to Welfare and Institutions Code section 12350. (*Stark, supra*, at p. 1117.) Thus, *Stark* did not read Welfare and Institutions Code section 12350 to prohibit any demand upon a relative for support when the person to be supported is receiving ABD aid. Instead, it limited Welfare and Institutions Code section 12350 to its historical purpose just as we do.

Father argues *Stark* is distinguishable because it involved a direct conflict between two provisions of the Welfare and Institutions Code whereas here Welfare and Institutions Code section 12350 creates an exception to Family Code section 3910. Father's argument ignores that Welfare and Institutions Code section 12350 creates exceptions not only for Family Code section 3910, but also "any other provision of" the Welfare and Institutions Code itself. Although Family Code sections 3910, 4400, 4410, Penal Code section 270c, and other provisions of the Welfare and Institution Code recognize that relatives have an obligation to provide support to immediate relatives to the extent of their ability, the government may not collect or seek to collect any reimbursement or advance from such relatives for SSP aid or for the cost of hospital care, medical care, or other service provided under the Welfare and Institutions Code to an SSP aid recipient. Thus, Father does not meaningfully distinguish *Stark*.

37

8. *Father's Arguments Based on the Text of Welfare and Institutions Code Section 12350 Are Unpersuasive*

Lastly, we address Father's remaining arguments that the text of Welfare and Institutions Code section 12350 supports his construction of that statute. Father first notes the use of the word "notwithstanding" in the sentence "Notwithstanding [s]ections 3910, 4400, and 4401 of the Family Code, or [s]ection 270c of the Penal Code, or any other provision of this code, no demand shall be made upon any relative to support" would be unnecessary if Welfare and Institutions Code section 12350 applied only to the government. He claims if Welfare and Institutions Code section 12350 applied only to government claims for aid contribution, there would be no conflict as the government would never be subject to Family Code sections 3910, 4400, or 4401, and the word "[n]othwithstanding" would be surplusage.

We read this "Notwithstanding . . ." language differently, in a way that gives effect to the language of the entire statute. Recall that in both the mid-1950s and the early 1970s, our Supreme Court addressed whether one could bootstrap the responsibilities imposed by Civil Code section 206 (the predecessor to Family Code section 3910) to justify government collection efforts against the relatives of aid recipients. (*Swoap v. Superior Court*, *supra*, 10 Cal.3d at p. 502; *County of San Mateo v. Boss*, *supra*, 3 Cal.3d at p. 969; *County of San Bernardino v. Simmons*, *supra*, 46 Cal.2d at p. 396.) When the "Notwithstanding . . ." sentence first appeared in 1961 in the predecessor statute to Welfare and Institutions Code section 12350, the Supreme Court had not yet opined on whether the relative responsibility provisions then in force with respect to aid

38

to the aged depended on an independent, preexisting duty such as that articulated in Civil Code section 206. (See *Swoap v. Superior Court*, *supra*, at p. 500; *County of San Mateo v. Boss*, *supra*, 3 Cal.3d at pp. 969, 971, fn. 8.) We assume the Legislature was aware of these cases when it amended Welfare and Institutions Code section 12350 (*People v. Garcia* (2006) 39 Cal.4th 1070, 1088), and sought to make clear through the "Notwithstanding . . ." sentence that government actors could not use Family Code section 3910 and similar statutes as a ground to evade Welfare and Institutions Code section 12350's bar on government collection efforts.

   *County of Contra Costa v. Lasky*, *supra*, 43 Cal.2d 506 and *County of San Bernardino v. Simmons*, *supra*, 46 Cal.2d 394 further support this interpretation. These cases maintained a "wall of separation" between the Welfare and Institutions Code and the Civil Code provisions that became the Family Code. (tenBroek, Part III, *supra*, at pp. 635, 637-638.) In *County of Contra Costa v. Lasky*, the court flagged the potential conflict between the two codes, but observed the Welfare and Institutions Code provisions "are complete in themselves and the liability of responsible relatives *to the county* is thereby established" in them. (*County of Contra Costa v. Lasky*, *supra*, at p. 509, italics added.) In *County of San Bernardino v. Simmons*, the court again emphasized that the Legislature intended the Welfare and Institutions Code "to cover completely the subject of recovery *by public agencies* from responsible relatives" and that the government could not proceed under Civil Code section 206 to recoup aid. (*County of San Bernardino v. Simmons*, *supra*, at pp. 396, 398, italics added.) Notably, the Legislature took no action to indicate it disagreed with these opinions. "It is

presumed, of course, that where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, the Legislature is aware of the judicial construction and approves of it." (*Rehabilitation Inst. of Chicago v. Einhorn* (1983) 141 Cal.App.3d 1036, 1040, citing *People v. Hallner* (1954) 43 Cal.2d 715, 719.)

Father next argues that Welfare and Institutions Code section 12350 explicitly references government actors only in its last sentence, where it states, "No county or city and county or officer or employee thereof shall threaten any such relative with any legal action against him by or in behalf of the county or city and county or with any penalty whatsoever." The prior sentences barring any demand and/or legal liability for payment do not specify to whom they apply. Father suggests this means the first part of the statute applies to everyone without limitation, and the last sentence is the only portion directed at government actors.

As described above, the legislative history indicates the Legislature passed Welfare and Institutions Code section 12350 and its predecessors to repeal the counties' and cities' statutorily-granted power to require responsible relatives to contribute towards support. The negative consequences of the responsible relatives' program outweighed its limited fiscal benefits, and government actors had abused their power by, for example, writing threatening letters to aged aid recipients. (See Comment, Domestic Relations, *supra*, 7 Pacific L.J. 421.) Keeping this history in mind, a more sensible reading of the statute is that it does not distinguish between two groups of *actors* but rather prohibits two types of *actions*—demands and threats—by the identified group of government actors. (See tenBroek, Part III, *supra*, at pp. 634-635 & fn. 872 [stating that the Legislature not

40

only repealed relative responsibility, but in prohibiting threats it also "proscribe[d] administrative pressure on relatives to make contributions in the absence of their legal liability"].)  Indeed, if the first part of the statute barring attempts to hold someone liable applied to everyone, one would expect the provisions against threatening legal action also to apply to everyone, but that is not what the statute says.  It makes little sense to prohibit everyone from bringing legal action but restrict the prohibition against threatening legal action to obtain payment in lieu of legal action to only a subset of actors.  The more reasonable reading, consistent with the legislative history, is that Welfare and Institutions Code section 12350 prohibits the specified government actors (and not others) from either threatening or in fact bringing a lawsuit against relatives seeking contribution for aid payments.

A recent amendment to Family Code section 3910 further contradicts Father's position that Welfare and Institutions Code section 12350 stands for the proposition that once the state has undertaken the obligation to provide support, the state alone bears the financial burden for such support.  For a disabled person over the age of 18 to be eligible for SSI (and therefore SSP), his or her income and resources must be below a certain level.  (See 20 C.F.R. § 416.1100.)  In June 2024, the Legislature amended Family Code section 3910 to clarify that a court may order a parent to pay support pursuant to Family Code section 3910 into a "special needs trust" within the meaning of title 42 of the United States Code section 1369p(d)(4)(A) or (C).  (Fam. Code, § 3910, as amended by Stats. 2024, ch. 2397, § 1; see 2024 Cal. Legis. Serv., ch. 25 (Assem. Bill No. 2397).)  Under such an arrangement, court-ordered support can potentially be exempted

41

from the calculation of whether an individual has the financial means to support themselves or instead qualifies for government assistance. (See Assem. Com. on Judiciary, com. on Assem. Bill No. 2397 (2023-2024 Reg. Sess.) p. 2. ["A primary purpose for establishing a special needs trust . . . is to preserve funds that can improve the beneficiary's quality of life without disqualifying that person from eligibility for SSI and other benefits"].) In other words, this amendment shows the Legislature expects that adult children with significant disabilities may be entitled to both government aid *and* court-ordered child support.

9.      *Public Policy Supports Our Construction of Welfare and Institutions Code Section 12350*

In addition to being unsupported by legislative history and the statutory text, Father's interpretation of Welfare and Institutions Code section 12350 would lead to problematic policy results. Family Code section 3910, which prevents where possible an incapacitated adult from becoming a public charge, would instead keep someone a public charge once they applied for or accepted aid. Parents of adult children with significant disabilities would have no obligation to contribute to the support of children who are unable to provide for themselves, even where those parents are indisputably able to contribute, whenever those children apply for or receive certain government aid. It would not matter if the children's needs far outstripped the aid they receive, or if contribution by a financially able parent would relieve the public of needing to provide support so that government aid dollars could be allocated to others in need. Such children or their caretaker parent would face a Hobson's choice: forego government aid to which the child is entitled in the hopes of later making a recalcitrant parent pay through a family law RFO, or

42

accepting government aid given immediate needs and foregoing the possibility of additional necessary support.

Father argues one can avoid these results simply by first petitioning for an order of support under Family Code section 3910, and then (and only then) applying for aid. That way, Welfare and Institutions Code section 12350 is not at issue when a court considers an RFO pursuant to Family Code section 3910. However, Father's interpretation of Welfare and Institutions Code section 12350 means it does not matter whether the family court RFO or the application comes first. Even if Mother had filed a successful RFO for support under Family Code section 3910 before Schuyler applied for aid, the later application for aid would void the prior family court order for support because Father could no longer "be held legally liable to support or to contribute to the support" of Schuyler given his son's application for or receipt of such aid. (Welf. & Inst. Code, § 12350.)

Father counters that, "Viewed from the perspective of a low income family, [his interpretation of Welfare and Institutions Code s]ection 12350 makes a great deal of sense. The family is relieved from having to contribute to the support of their disabled relative, because the government is footing the bill." However, Family Code section 3910 requires only that parents are responsible to maintain an incapacitated adult child "to the extent of their ability," and thus already accounts for the fact that not all parents may be able to pay support. Our construction of Welfare and Institutions Code section 12350 gives proper effect to both that section and Family Code section 3910 without regard to a parent's financial ability to provide support.

43

10. *Conclusion*

Because the trial court erred in giving preemptive effect to Welfare and Institutions Code section 12350, we remand for further proceedings.  Given its ruling, the trial court did not make factual findings on contested issues such as whether Schuyler is incapacitated from earning a living and without sufficient means, and, if so, what amount of support would be appropriate (including whether any such amount should be guideline support or something else), and to whom any support should be paid.  We express no opinion on these issues, which are for the trial court to address in the first instance.

**B.  The Attorney's Fees and Costs Ruling Is Vacated**

We review a family court's decision on the amount of fees and costs to award for abuse of discretion.  (*Pont v. Pont* (2018) 31 Cal.App.5th 428, 440.)  "Usually, when a trial court applies the incorrect legal standard in exercising its discretion, the appropriate disposition is to remand for the court to apply the proper standard.  [Citation.]" (*Doe v. Atkinson* (2023) 96 Cal.App.5th 667, 679.)  "Because we reverse the [ruling on the] child support order, we do not reach the attorney's fee issue.  The [family] court will reconsider the attorney's fee issue on remand after redetermining the merits of the child support order." (*In re Marriage of Corman* (1997) 59 Cal.App.4th 1492, 1502.)[13]

---

[13] Father moves to strike portions of Mother's reply brief, claiming they raise new arguments about the attorney's fees award.  We deny that motion.  Mother's reply brief does not raise new arguments that were not fairly reflected in her opening brief.  In any event, as we do not reach the attorney's fees issue, any allegedly new arguments have not prejudiced Father.

The family court did not bifurcate the proceeding so that the alleged preclusive effect of Welfare and Institutions Code section 12350 was decided before the evidentiary hearing. It nevertheless limited its award in part on its belief that the litigation presented a dispositive narrow legal issue such that the parties did not need to incur the expense of the full-blown evidentiary hearing the court conducted on Mother's RFO. As we hold Welfare and Institutions Code section 12350 did not bar Mother's RFO for support, numerous expenses that the court disallowed as unnecessary relating to things such as the extent of Schuyler's disabilities, his ability to support himself, and his reasonable needs were incurred on issues that will in fact need to be decided. Accordingly, the family court is to reconsider its attorney fees award on remand in connection with determining the merits of Mother's child support request.

## DISPOSITION

The order denying Mother's RFO for child support pursuant to Family Code section 3910 is reversed, the order granting Mother $20,000 in attorney's fees and litigation costs is vacated, and the matter is remanded for further proceedings. Mother is awarded her costs on appeal.

CERTIFIED FOR PUBLICATION


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



KLINE, J.*

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.